221 F.2d 42
 Arthur E. SUMMERFIELD, individually and as Postmaster General of the United States, Appellant,
v.
SUNSHINE BOOK COMPANY, Solair Union Naturisme, Inc., Commercial Distributors, Inc., and Margaret Brotherton, Appellees.
 No. 12026.
 United States Court of Appeals, District of Columbia Circuit.
 Argued May 17, 1954.
 Decided December 16, 1954.
 Writ of Certiorari Denied May 9, 1955.
 
 See 75 S.Ct. 661.
 Mr. Edward H. Hickey, Atty., Department of Justice, Washington, D. C., with whom Messrs. Leo A. Rover, U. S. Atty., and Stephen W. Terry, Atty., Department of Justice, Washington, D. C., were on the brief, for appellant. Mr. Lewis A. Carroll, Asst. U. S. Atty., Washington, D. C., entered an appearance for appellant.
 Mr. O. John Rogge, Washington, D. C., for appellees. Mr. Josiah Lyman, Washington, D. C., entered an appearance for appellees.
 Mr. Edward de Grazia, Washington, D. C., filed a brief on behalf of American Civil Liberties Union, as amicus curiae, urging affirmance.
 Before EDGERTON, WASHINGTON and DANAHER, Circuit Judges.
 WASHINGTON, Circuit Judge.
 
 
 1
 This is an appeal from a decision of the United States District Court for the District of Columbia enjoining the enforcement of two orders of the Postmaster General of the United States.[1] These orders were based on findings that appellees' publications were obscene within the meaning of 39 U.S.C.A. § 259a.[2] They provided that all mail addressed to the appellees was to be stamped "Unlawful" and returned to the senders, or, if nothing on the letters indicated the senders, forwarded to the dead letter branch of the Post Office. They further prohibited the payment of any postal money order drawn to the order of appellees, and instructed the local Postmaster to inform any remitter that payment was forbidden and that the amount thereof should be applied for and obtained by the remitter under the regulations of the Department.
 
 
 2
 The publications involved — Sunshine and Health, Solaire Universelle de Nudisme magazine (also referred to as Sun magazine), and Natural Herald — are nudist magazines which advocate and explain nudism and the nudist mode of living. They are illustrated with photographs of nude men, women and children, singly or in groups, sometimes shown as engaged in nudist living activities, sometimes shown in posed shots. Some of the pictures show the nude subjects at a distance and some show close views. Some of the pictures show the sexual parts of their subjects. Each of the issues of the magazines submitted at the Post Office hearings, with one exception, bore on the cover a large photograph in color of a nude young woman or women. There were also one, and sometimes two, other full-page posed photographs of a nude young woman or women in each issue of the magazines.
 
 
 3
 In the Post Office proceedings the Solicitor of the Post Office Department did not charge that the text of the magazines as such was obscene; in his view obscenity attached only to the photographs of nude men and women accompanying the text and appearing on the cover. The Hearing Examiner and the Postmaster General so found. Appellees, on the other hand, contend that without appropriate illustrations of nudist life much of the force of the text of the magazines would be lost. They say that such pictures, as used in these publications, merely illustrated and amplified the text by showing people practicing nudism in a normal and healthy environment and in the happy enjoyment of thoroughly innocent activities. According to appellees, the pictures used were the antithesis of anything suggestive or pornographic, some of the pictures were not without positive artistic merit, and all of them presented the human form "in accordance with the conceptions of nudists as to the most harmonious relationship between human beings and the earth."
 
 
 4
 Thereafter appellees brought proceedings in the District Court seeking to enjoin the enforcement of the order. At the hearing of the request for a preliminary injunction all parties agreed that the decision of the court on that request should be treated as a decision on appellees' prayer for a permanent injunction. At the end of the hearing the court found that the magazines taken as a whole were not likely to promote lustful feelings or excite the sexual passions and were not obscene. Accordingly, the court granted the permanent injunction requested by the appellees.
 
 
 5
 On this appeal, appellant contends that the court below incorrectly substituted its own opinion for the determination of the Postmaster General that the appellees' publications were obscene, that there was sufficient evidence of obscenity to support the determination of the Postmaster General as a proper exercise of his statutory function, that the exclusion from the administrative hearing of expert testimony on the question of obscenity was not a denial of due process, and that neither the statute nor the Postmaster General's orders violated the First or Fifth Amendments of the Federal Constitution.
 
 
 6
 Appellees, on the other hand, contend that 39 U.S.C.A. § 259a does not apply to the transmission through the mails of books, magazines or other publications, but that, if it is so applicable, it was applied by the Postmaster General in the instant case in a manner which violates the First Amendment of the Constitution of the United States, in that it constitutes a prior restraint upon the freedom of the press in contravention of that Amendment, and a penalty imposed for the exercise of a right guaranteed thereunder. Appellees further contend that the Postmaster General's application of the statute was an unreasonable means, if any at all, of accomplishing the ends sought by Congress; that it was based upon a standard so vague and nebulous as to contravene the due process clause of the Fifth Amendment of the Constitution; that Section 259a was inapplicable to appellees' publications under the doctrine of American School of Magnetic Healing v. McAnnulty, 1902, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90; and that in any event the decision of the court below holding the publications of the appellees not to be obscene was correct.
 
 
 7
 We turn first to appellees' contention that Section 259a is not applicable to publications. Section 259a, in describing the forbidden class of mail, uses broadly the words "article, matter, thing, device or substance." It does not, however, refer specifically to books, pamphlets and copies of magazines. It is thus in sharp contrast to other statutes in this general field, where Congress was careful to spell out the impact of the legislation on published works and periodical literature.[3] But the issue here involves not the magazines published by appellees as a whole, but only the pictorial illustration of their text. Such pictures may well constitute "matter" within the purview of Section 259a. The few cases in which this section has been applied by the courts point to that conclusion. In Rouzer v. Fanning, D.C.S.D. Cal., Civ.No. 138-54, Unreported, the statute was applied to photographic color transparencies, and in Door v. Donaldson, 1952, 90 U.S.App.D.C. 188, 195 F.2d 764, it was treated as including motion picture films. The conclusion that Section 259a may be applied to pictures is supported by the fact that it was patterned on Section 259 of the same Title, which permits the imposition of similar restrictions on the rendering of postal services in cases where the mails are used in furtherance of fraudulent schemes. Under that section steps have been taken to restrict indirectly the circulation of printed matter,[4] although fraud orders under that section do not appear to have been directed against the publication of magazines as such.[5]
 
 
 8
 We must therefore reject the contention that Section 259a is wholly inapplicable to the pictorial illustrations involved in this case. But we must nevertheless recognize that the power of the Post Office Department to exclude material from the mails and to intercept mail addressed to a person or a business is a power "that touches basic freedoms. It might even have the effect of a prior restraint on communication in violation of the First Amendment, or the infliction of punishment without the due process of law which the Fifth and Sixth Amendments guarantee." This warning was given by Mr. Justice Douglas in a case which recently came before him on application for a stay.[6] He went on to emphasize that "the power to impound mail should not be lightly implied," and that the exercise of that power "may as effectively close down an establishment as the sheriff himself."[7]
 
 
 9
 Should this court then construe Section 259a to authorize the issuance of orders of indefinite duration which hamper or prevent the continuance of the publication and distribution of a magazine — with a substantial and admittedly innocuous text — because its past issues have been found to contain some obscene illustrations, although none of its future issues may contain obscene matter within the meaning of the statute? In determining this question — which we think is crucial to the case — we are aided by a decision of the Supreme Court in a somewhat similar situation, arising under Section 259.
 
 
 10
 In Donaldson v. Read Magazine, 1948, 333 U.S. 178, 68 S.Ct. 591, 92 L.Ed. 628, the Postmaster General had issued a fraud order to prevent receipt of mail relative to a contest conducted by the defendant's magazines, and the receipt of money orders by which would-be contestants were paying fees to enter into the contest, because the advertising for the contest was deemed by him to have been false and fraudulent. The Supreme Court of the United States sustained this finding of fact. But the Postmaster General's order prohibited not only the delivery of mail and the payment of money orders made payable to the puzzle contest or the contest editor, but also the delivery of all mail addressed, and the payment of all money orders payable, to the defendant's magazines "Facts" and "Read" and their personnel. The order was not limited to the particular fraudulent contest. On this point, the Supreme Court said, 333 U.S. at page 182, 68 S.Ct. at page 594:
 
 
 11
 "The order, if indefinitely enforced, might have resulted in barring delivery of mail and payment of money orders in relation to other non-fraudulent contests as well as legitimate magazine business. All of the foregoing raised questions about the validity and scope of the original order, if unmodified, which we deemed of sufficient importance to justify further argument. For that reason we set the case down for reargument, requesting parties to discuss the validity and scope of the order, and whether, if invalid by reason of its scope, it could be so modified as to free it from statutory or constitutional objections."[8]
 
 
 12
 Before reargument, however, the Postmaster General revoked his order insofar as it applied to the lawful activities of the defendant and limited his order to contest mail.[9]
 
 
 13
 While, therefore, the issue as to the validity of the Postmaster General's original order in the Read Magazine case was not squarely decided, the attitude of the Court indicates strongly that orders under Section 259 must be limited to those activities of a defendant which are unlawful, and that future lawful activities of a defendant cannot be hampered in cases where he is engaged both in lawful and in unlawful activities.[10]
 
 
 14
 This limitation upon the Postmaster General's powers would seem to apply equally to action under Section 259a. That section was enacted by Congress in 1950 upon the request of the Postmaster General, because he considered that he did not possess legislative authority to impose adequate sanctions upon persons disseminating obscene matter, although mailing it was punishable as a crime under 18 U.S.C. § 1461. The Postmaster General reported to Congress that under the then state of the law he could refuse delivery of mail to persons selling obscene articles only within the narrow confines of 39 U.S.C.A. § 255, that is, if addressed to a fictitious, false or assumed name or address. He could not, he said, act against an addressee operating either under his true or corporate name. On the other hand, Section 259 of Title 39, authorizing return of mail and nonpayment of money orders, was limited to addressees engaged in frauds. In asking for the passage of the bill, which later became Section 259a, the Postmaster General stated that —
 
 
 15
 "In line with the authority vested in the Postmaster General in fraud cases by sections 259 and 732, title 39, United States Code, the proposed legislation is sought to authorize the Postmaster General to return to senders marked `Unlawful' all mail addressed to persons, firms, corporations, companies, partnerships or associations engaged in obtaining remittances of money or property of any kind through the mails in exchange for obscene, lewd, lascivious, indecent, filthy or vile articles, matters, things, devices, or substances, and to refuse to cash money orders and postal notes in connection therewith. This legislation will not unduly broaden the powers of the Postmaster General. He already has the power to return to senders mail addressed to concerns engaged in selling obscene materials under fictitious names. The proposed legislation merely broadens his authority to cover these cases where true or corporate names are used.
 
 
 16
 "It is believed that the proposed legislation submitted herewith is adequate to accomplish the purpose desired and its enactment is recommended."[11]
 
 
 17
 This legislative background suggests that the Postmaster General's powers under Section 259a are to be construed in much the same manner as his powers under the fraud section, 39 U.S. C.A. § 259. Clearly, the Postmaster General did not seek, and Congress did not intend to confer upon him, wider powers in regard to the prevention of dissemination of obscene matters through the mails than he possessed with regard to the prevention of the use of the mails for frauds.
 
 
 18
 In consequence, orders of the Postmaster General under Section 259a appear to be subject to the same necessary limitations as were indicated in the Read Magazine case. They must be confined to materials already published, and duly found unlawful. Whether such limitation is practically possible, in cases like the present, is not for this court to determine. It may perhaps be argued that the sweeping orders here involved should be upheld — contrary to all the inferences to be drawn from the Read Magazine case — on the ground that from past unlawful conduct of appellees, as the Postmaster General sees it, he may conclude that such conduct will continue and that he will again have cause to find future issues of the magazines obscene.[12] But there is and can be no finding now that any particular future issue of the appellees' magazines will be obscene and will provide a basis for the sanctions which the Postmaster General may impose under Section 259a. To let the present orders stand would permit the Postmaster General to prevent — in practical effect — the continued publication of a magazine without any advance knowledge that its future issues will be in violation of law, and thus to suppress putatively lawful activities.[13] Grave constitutional questions would then be presented. See Donaldson v. Read Magazine, supra, 333 U.S. at pages 181-182, 189, 68 S.Ct. at pages 593-594, 597, et seq.; Hannegan v. Esquire, Inc., supra; Stanard v. Olesen, supra, 74 S.Ct. at pages 770-771. See also Superior Films v. Department of Education of Ohio, 1954, 346 U.S. 587, 74 S.Ct. 286; Joseph Burstyn, Inc. v. Wilson, 1952, 343 U.S. 495, 502, 72 S.Ct. 777, 96 L.Ed. 1098.
 
 
 19
 We do not interpret Section 259a as authorizing orders which raise serious constitutional questions of this sort. We cannot conclude, in the light of these considerations, that Congress intended by the enactment of Section 259a to authorize the indefinite suppression of periodical publications because one or another issue may contain obscene material. Some day Congress may perhaps give that authorization in specific terms, with proper guidance for and restrictions on administrative action, and with such safeguards as the Constitution may require. But Congress has not done so here.
 
 
 20
 Nothing in this opinion should be read to preclude the Postmaster General from taking appropriate steps to amend the orders issued against the appellees to limit them to their proper statutory scope within 39 U.S.C.A. § 259a, as defined in this opinion. Nothing herein is intended to prevent him from taking in the future such other action against appellees under that statute as may be appropriate. However, as they now stand, the orders of the Postmaster General herein are too broad and exceed the powers conferred upon him by 39 U.S.C.A. § 259a. It follows that the judgment of the District Court enjoining their enforcement should be affirmed.
 
 
 21
 In this view of the case, it does not become necessary to pass upon other questions raised by the appellees as to the constitutionality or applicability of this statute, as to the propriety of the Postmaster General's finding that the publications involved in his orders were obscene, see Parmelee v. United States, 1940, 72 App.D.C. 203, 113 F.2d 729, or the adequacy of the evidence and record upon which such a finding was based in the instant case.
 
 
 22
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Nos. 55219 and 55220, dated June 23, 1953
 
 
 [2]
 "§ 259a. Exclusion from mails of obscene, lewd, etc., articles, matters, devices, things, or substances
 "Upon evidence satisfactory to the Postmaster General that any person, firm, corporation, company, partnership, or association is obtaining, or attempting to obtain, remittances of money or property of any kind through the mails for any obscene, lewd, lascivious, indecent, filthy, or vile article, matter, thing, device or substance, or is depositing or is causing to be deposited in the United States mails information as to where, how, or from whom the same may be obtained, the Postmaster General may —
 "(a) instruct postmasters at any post office at which registered letters or any other letters or mail matter arrive directed to any such person, firm, corporation, company, partnership, or association, or to the agent or representative of such person, firm, corporation, company, partnership, or association, to return all such mail matter to the postmaster at the office at which it was originally mailed, with the word `Unlawful' plainly written or stamped upon the outside thereof, and all such mail matter so returned to such postmasters shall be by them returned to the senders thereof, under such regulations as the Postmaster General may prescribe; and
 "(b) forbid the payment by any postmaster to any such person, firm, corporation, company, partnership, or association, or to the agent or representative of such person, firm, corporation, company, partnership, or association, of any money order or postal note drawn to the order of such person, firm, corporation, company, partnership, or association, or to the agent or representative of such person, firm, corporation, company, partnership, or association, and the Postmaster General may provide by regulation for the return to the remitters of the sums named in such money orders or postal notes."
 
 
 [3]
 An example is the criminal statute against mailing obscene matter, 18 U.S.C. § 1461 (1951). See also 18 U.S.C. § 1462 (1951); 19 U.S.C. § 1305 (1951)
 
 
 [4]
 See, for example, Donaldson v. Read Magazine, 1948, 333 U.S. 178, 68 S.Ct. 591, 92 L.Ed. 628; Reilly v. Pinkus, 1949, 338 U.S. 269, 70 S.Ct. 110, 94 L. Ed. 63
 
 
 [5]
 But cf. Brooklyn Daily Eagle v. Voorhies, 2 Cir., 1910, 181 F. 579, where the court seems to have assumed the power of the Postmaster General to exclude from mailing under postal regulations then in effect copies of a newspaper carrying an advertisement deemed fraudulent. However, an injunction against the local postmaster was granted there because the court found that the advertisement was actually not fraudulent
 
 
 [6]
 Stanard v. Olesen, opinion of Douglas, Circuit Justice, 9 Cir., May 22, 1954, 74 S.Ct. 768, 771, 98 L.Ed. 1151, citing the dissents of Mr. Justice Holmes and Mr. Justice Brandeis in Leach v. Carlile, 258 U.S. 138, 140, 42 S.Ct. 227, 66 L.Ed. 511, and in United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson, 255 U.S. 407, 417, 436, 41 S.Ct. 352, 65 L. Ed. 704, and the concurring opinion of Judge Frank in Roth v. Goldman, 2 Cir., 1949, 172 F.2d 788, 790; cf. Hannegan v. Esquire, Inc., 1946, 327 U.S. 146, 157-158, 160, 66 S.Ct. 456, 90 L.Ed. 586
 
 
 [7]
 74 S.Ct. at page 771
 
 
 [8]
 The Court's order read as follows:
 "`This case is ordered restored to the docket for reargument. On reargument counsel need not further discuss the sufficiency of the evidence to support the Postmaster General's findings. They are requested to discuss the following:
 "1. Does the fraud order prohibit delivery of mail and postal money orders to Facts Magazine and all its employees, including its editor-in-chief? If so,
 "(a) Is the order within the Postmaster General's authority under 39 U.S.C. Secs. 259, 732?
 "(b) If so, do these code provisions, in violation of the First Amendment or any other constitutional provisions, abridge the freedom of speech or press of either the senders or the sendees of the mail or the money orders?
 "2. Does the fraud order prohibit indefinitely the delivery of mail or money orders which relate to subject matters or contests other than the contest on which the order is based? If so,
 "(a) Is the order within the Postmaster General's statutory authority?
 "(b) If so, are these code provisions in conflict with the Constitution of the United States?
 "3. Assuming that the order is in conflict with the code provisions or the Constitution, can it be modified in such way as to free it from statutory or constitutional objections? If so, by whom can the order be modified and by what procedure?'" 333 U.S. at page 182, 68 S.Ct. at page 594.
 
 
 [9]
 See, also, Hoover v. McChesney, 6 Cir., 1897, 81 F. 472 (local postmaster's right to withhold mail limited to such mail as was clearly connected with the prohibited lottery conducted by plaintiff). But see Public Clearing House v. Coyne, 1904, 194 U.S. 497, 510, 24 S.Ct. 789, 48 L. Ed. 1092, rejecting this distinction. However, these cases involve the complainant's conduct of what was solely an illegal business
 
 
 [10]
 In the instant case continuance of appellees' business would be hampered or restrained by the Postmaster General's order as long as it remained in force, even though appellees in fact complied in future issues of their magazines with the standards indirectly imposed by the Postmaster General. It has been suggested in an ordinary fraud case not involving a magazine that the order should be held valid because in the event of cessation of fraudulent conduct the addressee of mail could bring a further suit to enjoin continued enforcement of the order against him, Neher v. Harwood, 9 Cir., 1942, 128 F.2d 846, 158 A.L.R. 1116. This possibility is, however, hardly an adequate protection of appellees' rights
 
 
 [11]
 Sen.Rep.No.2179, 81st Cong., 2d Sess. (1950)
 
 
 [12]
 There is no contention that each and every past issue of each and every magazine published by the appellees is obscene. In fact, obscenity is only predicated upon the presence of certain illustrations upon the cover of and inside the magazines, their text being admittedly unobjectionable
 
 
 [13]
 See United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson, supra (Brandeis, J., dissenting); Reilly v. Pinkus, 1949, 338 U.S. 269, 277, 70 S. Ct. 110, 94 L.Ed. 63
 
 
 
 23
 DANAHER, Circuit Judge (dissenting).
 
 
 24
 I agree that 39 U.S.C.A. § 259a, quoted in the majority opinion has applicability here. I agree that the Postmaster General's powers under that section "are to be construed in much the same manner as his powers under the fraud section, 39 U.S.C.A. § 259," as the majority observes. However, I would reverse the order of the District Court, and I wish briefly to note the reasons for the position I take.
 
 
 25
 The Constitution vested in Congress the power not only to establish post offices and post roads but to regulate the entire postal system of the country, even to the exclusion from the mails of "such printed matter or merchandise as may seem objectionable to it upon the ground of public policy * * *." Public Clearing House v. Coyne, 1904, 194 U.S. 497, 507, 24 S.Ct. 789, 793, 48 L.Ed. 1092. More importantly and bearing directly upon the issue presented here, the Court said, 194 U.S. at page 507, 24 S.Ct. at page 793, that in aid of enforcement of its public policy, Congress possesses the power to "forbid the delivery of letters to such persons or corporations as in its judgment, are making use of the mails for the purpose of fraud or deception or the dissemination among its citizens of information of a character calculated to debauch the public morality." (Emphasis supplied.) Again, Id., 194 U.S. at page 508, 24 S.Ct. at page 793, the Court continued: "For more than thirty years not only has the transmission of obscene matter been prohibited, but it has been made a crime, punishable by fine or imprisonment, for a person to deposit such matter in the mails. The constitutionality of this law we believe has never been attacked."
 
 
 26
 The majority opinion says "* * * orders of the Postmaster General under Section 259a appear to be subject to the same necessary limitations as were indicated in the Read Magazine case. They must be confined to materials already published, and duly found unlawful. Whether such limitation is practically possible, in cases like the present, is not for this court to determine * * *." The position thus stated seems to me to be contrary to that set forth in the Coyne case in which the Supreme Court said, 194 U.S. at page 510, 24 S.Ct. at page 794:
 
 
 27
 "Nor do we think the law unconstitutional, because the Postmaster General may seize and detain all letters, which may include letters of a purely personal or domestic character, or having no connection whatever with the prohibited enterprise. In view of the fact that by these sections the Postmaster is denied permission to open any letters not addressed to himself, there would seem to be no possible method of enforcing the law except by authorizing him to seize and detain all such letters. It is true it may occasionally happen that he would detain a letter having no relation to the prohibited business; but where a person is engaged in an enterprise of this kind, receiving dozens and perhaps hundreds of letters every day, containing remittances or correspondence connected with the prohibited business, it is not too much to assume that, prima facie at least, all such letters are identified with such business. A ruling that only such letters as were obviously connected with the enterprise could be detained would amount to practically an annulment of the law, as it would be quite impossible, without opening and inspecting such letters, which is forbidden, to obtain evidence of the real facts."[1]
 
 
 28
 Just as Congress has power to control the use of the mails for perpetration of swindling schemes, in the exercise of that same power it authorized the Post Office Department to act with reference to the exclusion from the mails of obscene matter "upon evidence satisfactory to the Postmaster General." (Emphasis supplied.)
 
 
 29
 In this case the Hearing Examiner found that "the obscene and indecent character of the magazines at issue is evident from a mere inspection thereof." The Postmaster General "upon evidence satisfactory to him" determined that the material in question was "obscene by any standard recognized by the courts. Considering all whom the publications are likely to reach in their sale to the public generally, it is certain that they are erotically and lustfully stimulating and sexually provocative to the average male person viewing them."[2] Despite the Postmaster General's exercise of the authority vested in him, the trial judge said: "I see no limit except my own judgment in this case," (J.A. 86) and again "I just do not agree with the Postmaster General and I grant the injunction." (J.A. 89.)
 
 
 30
 In National Conference on Legalizing Lotteries, Inc. v. Farley, 1938, 68 App. D.C. 319, 321, 322, 96 F.2d 861, 863, certiorari denied 1938, 305 U.S. 624, 59 S.Ct. 85, 83 L.Ed. 399, this court applying the standard prevailing under § 259 said "In view of what has been already said, it is apparent that the question here is whether there was any reasonable basis for believing that the present contest is a lottery or `scheme for the distribution of money * * * by * * * chance,' for if there was, the action of the Postmaster General must stand. If not, there is no statutory basis for his order, and it must fall." That was the test as announced by Chief Judge Groner and he concluded that "the law commits the initial decision to the discretion of the Postmaster General, who is authorized to act `upon evidence satisfactory to him,' and we are powerless unless his ruling is palpably wrong." See also Farley v. Simmons, 1938, 69 App.D.C. 110, 99 F.2d 343, certiorari denied, 1938, 305 U.S. 651, 59 S.Ct. 244, 83 L.Ed. 422.
 
 
 31
 In Near v. State of Minnesota, ex rel. Olson, 1931, 283 U.S. 697, 715-716, 51 S.Ct. 625, 631, 75 L.Ed. 1357, Chief Justice Hughes said: "The objection has also been made that the principle as to immunity from previous restraint is stated too broadly, if every such restraint is deemed to be prohibited. That is undoubtedly true; the protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases * * *," and as one such he notes "On similar grounds, the primary requirements of decency may be enforced against obscene publications."
 
 
 32
 The material here was found by the Postmaster General to be obscene. If it were open to me to pass on the exhibits, I would agree. The case is not like Hannegan v. Esquire, Inc., 1946, 327 U.S. 146, 66 S.Ct. 456, 90 L.Ed. 586, where, at page 158, Mr. Justice Douglas noted "The validity of the obscenity laws is recognition that the mails may not be used to satisfy all tastes, no matter how perverted." At page 159, Mr. Justice Frankfurter, concurring, noted even the more sharply the distinction between the Esquire case and one like this when he pointed out "Matters that are declared nonmailable (Criminal Code § 211, 35 Stat. 1129, 36 Stat. 1339, 18 U.S.C. § 334) are of course not `literature' within the scope of the second-class privilege."
 
 
 33
 The only officer designated to administer the will of Congress in this situation is the Postmaster General. Unless his findings are "palpably wrong," the trial court was in error in substituting its judgment for that of the officer commanded to execute the public policy pronounced by Congress. The initial decision of the Hearing Examiner makes clear that he took into account not only the facts and circumstances upon which the hearing proceeded but the law applicable thereto. Cogently, the order of the Postmaster General did likewise. In Parmelee v. United States, 1940, 72 App.D.C. 203, 211, 113 F.2d 729, 737, this court said: "The determining question is, in each case, whether a publication, taken as a whole, has a libidinous effect." The Postmaster General "upon evidence satisfactory to him," applied that test and found against the publications. Judge Vinson (later Chief Justice) dissenting in that case, 72 App.D.C. at page 216, 113 F.2d at page 742, cautioned: "Certainly, it seems difficult to conclude that no reasonable man could say that this book offends the community standard and, with a District Court finding that the book with its pictures is obscene, I am unable to understand how my brethren can stand on that proposition." Of course that case involved a libel under the Tariff Act, 19 U.S.C.A. § 1305(a), properly triable in the District Court. Here, the court has nothing to do with the findings of the Postmaster General unless they are "palpably wrong." Here, that most of the scores of pictures in a score or more of exhibits are obscene seems to me as plain as the figures and the parts thereof depicted.
 
 
 34
 I cannot believe that the First Amendment or any other amendment affords protection against previous restraint against publications, the pattern of which so clearly emerges from each separate issue. Thinking thus, I would have no difficulty in concluding that the government may as a matter of public policy withdraw the facilities to pander the obscenity condemned by the Congress. The enforcement of the statute has been committed to the Postmaster General. The trial judge erred in substituting his judgment for that of the duly designated officer and the order of injunction should be reversed.
 
 
 
 Notes:
 
 
 [1]
 In Donaldson v. Read Magazine, 1948, 333 U.S. 178, 190, 68 S.Ct. 591, 598, 92 L.Ed. 628, the Supreme Court itemized a series of statutes and commented: "All of the foregoing statutes, and others which need not be referred to specifically, manifest a purpose of Congress to utilize its powers, particularly over the mails and in interstate commerce, to protect people against fraud. This governmental power has always been recognized in this country and is firmly established. The particular statutes here attacked have been regularly enforced by the executive officers and the courts for more than half a century. They are now part and parcel of our governmental fabric. * * *" Specifically rejecting the contention that the court should overrule the Coyne case, Id., 333 U.S. at page 194, 68 S.Ct. at page 598, the Court continued: "None of the recent cases to which respondents refer, however, provide the slightest support for a contention that the constitutional guarantees of freedom of speech and freedom of the press include complete freedom, uncontrollable by Congress, to use the mails for perpetration of swindling schemes."
 Against this background Congress enacted § 259a, the applicability of which is here involved.
 
 
 [2]
 The findings of the Hearing Examiner disclose that the respondents "are obtaining and endeavoring to obtain remittances of money through the mails * * * and are depositing or causing to be deposited in the United States mails, information as to where, how and from whom such magazines may be obtained * * *."
 Submitted as evidence were 24 issues of "Sunshine and Health," a monthly publication, from March 1951 through March 1953, 7 issues of "Sun Magazine," a bimonthly publication, from January-February 1952 to March-April 1953, and the July 1952 issue of "Natural Herald." After reciting specific details as to the particulars in which the publications were found to be obscene, the Hearing Examiner concluded: "It is clear that the magazines here involved are sold and distributed to all who wish to purchase them, whether they be men, women or children. The public is solicited generally and indiscriminately * * *."