SUNSHINE PUBLISHING COMPANY, a corporation, Plaintiff

v.

Arthur E. SUMMERFIELD, individually and as Postmaster General of the United States, Defendant.

Civ. A. No. 1125–59.

United States District Court District of Columbia.

May 20, 1960.

O. John Rogge, New York City, Josiah Lyman, Washington, D. C., for plaintiff.

Oliver Gasch, U. S. Atty., Edward P. Troxell, Principal Asst. U. S. Atty., John F. Doyle, Asst. U. S. Atty., Harold D. Rhynedance, Jr., Asst. U. S. Atty., Washington, D. C., Donald B. MacGuineas, Atty. for Dept. of Justice, Andrew P. Vance, Washington, D. C., of counsel, for defendant.

**YOUNGDAHL, District Judge.**

Plaintiff is the publisher of "Sunshine and Health" and "Sun Magazine", two publications not unknown to the judicial process nor to the defendant.[1] On January 16, 1958, three days after the United States Supreme Court held that the magazines were not obscene (and therefore not prohibited from the mails by 18 U.S.C. § 1461), the plaintiff applied for second-class mail rates. Thereafter, plaintiff and the Post Office Department consumed some fifteen months in correspondence and negotiations until the plaintiff decided it had no choice but to bring this action.

On June 1, 1959, about five weeks after suit was filed and before defendant made any appearance in this case, the plaintiff's applications were formally denied with the following statement:

"The grounds for the denial are as follows:

"The Act of March 3, 1879, as amended (Title 39 United States Code 224 and 226) prescribes that only those newspapers and other periodical publications are embraced in mailable matter of the second class which, in addition to other conditions, are originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or some special industry and are not designed primarily for advertising purposes.

"Examination of the publication [identical letters were sent regarding each publication] reveals that:

"1. The publication is not originated and published for the dissemination of information of a public character or devoted to literature, the sciences, arts, or some special industry (39 U.S.C. 226).

1. Summerfield v. Sunshine Book Co., 1954, 95 U.S.App.D.C. 169, 221 F.2d 42 (affirming Judge Schweinhaut's order in Civil Action Number 3007–53), certiorari denied 1955, 349 U.S. 921, 75 S.Ct. 661, 99 L.Ed. 1253; Sunshine Book Co. v. Summerfield, 1958, 355 U.S. 372, reversing, 1957, 101 U.S.App.D.C. 358, 249 F.2d 114, 78 S.Ct. 365, 2 L.Ed.2d 352, which had affirmed D.C.D.C.1955, 128 F. Supp. 564.

"2. The publication is designed to advertise and promote the business of the publisher, its owners, affiliates and advertisers in that the publication consists primarily of advertising and editorial write-ups and other copy designed to create patronage for the foregoing. (39 U.S.C. 226; CFR 22.2(b)(6); 39 CFR 22.-2(b)(6) (ii)(iii); Postal Manual, sections 132.226 and 132.226(b) and 132.226(c).

"3. The publication is not a mailable publication under 14 [*sic*] USC 1461; 39 CFR 22.2(a)(1); Postal Manual, section 132.211).

"A copy of the Rules of Practice in Proceedings Relative to the Denial, Suspension or Annulment of Second-Class Mail Privileges is enclosed. You may appeal this action in accordance with the procedural regulations set out in Rule 7(b). The rules were published on May 5, 1959, in 24 Federal Register, page 3592."

After the fifteen-day period for taking an appeal under the new rules had expired, the defendant moved to dismiss the complaint on the ground that the plaintiff had not exhausted his administrative remedies in that the plaintiff had not appealed from the denial of June 1, 1959. Plaintiff argued in opposition to the motion that one need exhaust administrative remedies before coming to court only when administrative remedies are available since, otherwise, there is nothing to exhaust; since the Post Office Depart-

ment had persisted, prior to suit, in not taking action on its applications, plaintiff could properly request and receive judicial relief; furthermore, this right to seek relief in court could not be divested by administrative maneuvers—such as changes in rules and regulations [2]—occurring after the complaint had been filed.

Judge Hart of this court heard the defendant's motion and denied it without opinion.

The defendant filed an answer and both parties then moved for summary judgment, the defendant also asking, alternatively, to have the case remanded to the Post Office Department.

■■ The principal contention now advanced by the defendant is that this court has no jurisdiction because plaintiff has not exhausted his administrative remedies and, in any event, the case should be "remanded" to the Post Office Department. But Judge Hart's ruling is the law of the case; it rejected this exhaustion argument and, fairly construed, rejected this new request to "remand" since any "remand", in effect, would be a dismissal for failure to exhaust administrative remedies. "A judge should hesitate to undo his own work. * * * Still more should he hesitate to undo the work of another judge." Peterson v. Hopson, 1940, 306 Mass. 597, 603, 29 N.E.2d 140, 145, 132 A.L.R. 1; and see Annotation, 1941, 132 A.L.R. 14; 1 Moore's Federal Practice 4213–4217. Besides, I am in agreement with Judge Hart that under the circumstances the

---

2. Plaintiff filed its complaint on April 23, 1959; on May 5, 1959, the Post Office Department issued new rules of practice "in proceedings relative to the denial, suspension or annulment of second-class mail privileges". 39 C.F.R. part 204; also found in 24 F.R. 3592 which contains the following prefatory statement:

"Because of the procedural nature of these rules, the Post Office Department has found that general notice of proposed rule making and public procedure thereon are unnecessary, and that good cause exists why these rules should be made effective without a period of prior notice.

"The Department will continue to study the problems involved in the rules with respect to second-class privileges with a view to making such further changes as may from time to time appear to be desirable. Members of the bar, publishers, and others are invited to submit any further comments and suggestions they may have to the Department.

"The following rules in new Part 204 supersede the rules of procedure in § 201.40, and are made effective as to all proceedings, pending or filed, upon publication in the Federal Register."

plaintiff could abandon its efforts with the Post Office Department and come to court.

▮ Thirteen months after plaintiff filed its applications, Herbert B. Warburton, General Counsel for the Post Office Department with whom plaintiff conducted much of its negotations, wrote to the plaintiff and carefully set forth what the Department considered defects in the original applications. Counsel for plaintiff then supplied the Department with what he and his client thought—and what appears to the court to have been—the necessary information to correct the defects. When yet another six weeks elapsed without word from the Post Office Department,[3] plaintiff brought this action. Clearly the plaintiff did not desire delay during this fifteen months; it was seeking the second-class rates and it wanted authorization for these lower rates as soon as possible. After a full review of the record, the conclusion becomes inescapable that the Post Office Department handled plaintiff's applications with a gingerly restraint amounting to outright reluctance. It is well settled that when the administrative procedure is inadequate or unavailable, it need not be exhausted prior to the invocation of judicial action. 3 Davis, "Administrative Law Treatise" § 20.07 and cases cited. "Having filed its suit, it was not required to abandon that suit and resume the administrative procedure." Southeastern Oil Florida v. United States, 1953, 115 F.Supp. 198, 201, 127 Ct.Cl. 480.

Plaintiff's publications are entitled to second-class mail rates if they satisfy the conditions of 39 U.S.C.A. § 226. This statute reads:

"Except as otherwise provided by law, the conditions upon which a publication shall be admitted to the second class are as follows: First. It must regularly be issued at stated intervals, as frequently as four times a year, and bear a date of issue, and be numbered consecutively. Second. It must be issued from a known office of publication. Third. It must be formed of printed sheets: *Provided,* That publications produced by the stencil, mimeograph, or hectograph process or in imitation of typewriting shall not be regarded as printed within the meaning of this clause. Fourth. It must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or some special industry, and

---

3. Counsel for plaintiff sent the information to Warburton along with a letter stating that counsel believed this supplied the information requested by the Department. The letter ended, "Will you let me hear from you?" One month later, not having had a reply from Warburton or the Department, counsel wrote:

"Dear Mr. Warburton:

"I note that I have had no reply to my letter of February 26, 1959. May I hear from you? If a trip to Washington on my part would be helpful, please do not hesitate to suggest it."

Not receiving a reply to this letter, counsel wrote again on April 3, 1959 and said:

"Dear Mr. Warburton:

"I am much troubled at not hearing from you, and I find it difficult to explain the long delay to my client. I am satisfied that you are giving your full efforts to doing an able and conscientious job, and I want to cooperate in every way that I can, but may I not hear from you? I will arrange to come to Washington again if that will be helpful."

On April 10, 1959, Earle D. Goss, Assistant General Counsel, wrote on behalf of Warburton, saying:

"Gentlemen:

"This will acknowledge, with thanks, your letter of April 3, 1959, in which you advise that you are troubled at not hearing from me.

"*I have no way of locating the matter about which you wrote in your letter of April 3 since you inadvertently neglected to advise the name of your client.*

"I assure you that immediately upon receipt of your advice as to who you represent, a review will be made of our file in connection with the matter, and I will advise you of the status thereof." (Emphasis added.)

having a legitimate list of subscribers. Nothing herein contained shall be so construed as to admit to the second class rate regular publications designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates."

The defendant's answer admits the publications satisfy the first three conditions of § 226; the satisfaction of the fourth condition and the last sentence of § 226 is in dispute.

Since the material facts are uncontroverted, summary judgment may be given to the party entitled to it as a matter of law.

In paragraph 66 of its complaint, the plaintiff alleges that from March, 1955, its issues of "Sunshine & Health" and "Sun Magazine" are "substantially similar to and identical with the prior issues * * * and particularly those issues held to be not obscene by Federal District Judge Henry A. Schweinhaut * * * and the United States Supreme Court * * *". Defendant's answer has admitted this allegation so that obscenity is not in issue; "non-mailability under 18 U.S.C. § 1461, has been withdrawn as a reason [for the denial of plaintiff's applications].[4]" Furthermore, as Judge Frederick van Pelt Bryan has written, there is a tacit holding in the per curiam decision of the Supreme Court in Sunshine Book Co. v. Summerfield, supra, note 1, that "the magazine there under consideration, published by a bona fide group devoted to the cult of nudism, and containing pictures of nudists in the nude, was not obscene. There was no question of the sincerity of purpose of the publishers and the objective of the photographs and text was not an appeal to prurient interest." [5]

Plaintiff's publications have a legitimate list of subscribers and are sold on newsstands. That the Post Office does not seriously contend otherwise is shown by a comparison of the General Counsel's recommendation to the Director of the Postal Services Division on January 27, 1959 (before plaintiff filed the supplemental information) and the grounds given for the denial of plaintiff's applications on June 1, 1959 (after plaintiff filed the supplemental information).

The affidavit of Edwin A. Riley, Director of the Postal Services Division, reads in part:

"On January 27, 1959, the General Counsel of the Post Office Department advised affiant that in his opinion the applications filed on behalf of these magazines should be denied because:

"(a) the applications were incomplete;

"(b) the publications are designed primarily for advertising purposes and therefore not entitled to entry under 39 USC 226;

"(c) each issue of each publication issued since January, 1958 is nonmailable;

"(d) the application and circulation data contained therein, together with supplemental information provided by the publisher, does not establish that the publications have a legitimate list of subscribers."

Comparing the above with the grounds set forth in the June 1, 1959, denial, it can be seen that (a) and (d) above were dropped.

Riley's affidavit does express some dismay: "It is to be noted from the information submitted by the publisher that of the 48,998 copies of the December 1958 issue of Sunshine & Health distributed, only 5,725 were distributed to regular subscribers who had paid the publisher the full advertised subscription price." Why "only" 5,725? That exceeds 11% of the total sold and hardly shows that the list of subscribers was not legitimate. Furthermore, the Department apparently should include in the "list of subscribers" those persons

4. Defendant's Memorandum of Points and Authorities (filed January 22, 1960) at p. 10.

5. Poss v. Christenberry, D.C.S.D.N.Y. 1959, 179 F.Supp. 411, 416.

who purchase their copies at a newsstand. 39 C.F.R. § 22.2(b) (5) reads:

> "Publications must have a list of persons who have subscribed by paying or promising to pay for copies to be received during a stated time. When news agents purchase copies for resale or receive copies on consignment for sale, only the persons who buy copies from the news agents may be included in the subscription list."[6]

■ The Court is of the opinion that plaintiff's publications satisfy the fourth condition of § 226 in that they are either "of a public character" or are "devoted to * * * some special industry". The precepts of nudism presented by "Sunshine & Health" and "Sun Magazine" do not have the public acceptance given the ideas and way of life presented by "Ladies' Home Journal" and "House and Garden",[7] but they are not, for that rea-

son, undeserving of equal treatment by the Postal Service. And see discussion in Hannegan v. Esquire, Inc., 1946, 327 U.S. 146, 66 S.Ct. 456, 90 L.Ed. 586.

The June first denial states:

> "2. The publication is designed to advertise and promote the business of the publisher, its owners, affiliates and advertisers in that the publication consists primarily of advertising and editorial write-ups and other copy designed to create patronage for the foregoing. * * *"

■ What is meant by "advertising" in § 226 is a legal question and one whose resolution is aided by the previous provision in § 226 that publications devoted to some special industry may receive second-class rates. Clearly plaintiff's publications "advertise" nudism—in the sense that the publications "advocate and explain nudism and the nudist mode of living."[8] But in 1877, the Annual Re-

---

6. Riley's affidavit also discusses discrepancies in plaintiff's reporting of the number of October, 1958 issues sold, but this is completely immaterial. If the Post Office Department was concerned about what the exact figure was, they would have considered the applications incomplete and denied them for that reason. But the applications were denied "on the merits". This is especially pointed when it is realized that one of the Department's newly promulgated rules of practice expressly authorizes a denial for incompleteness:

   "A publisher may file an application for entry of a publication as second class mail (Part 22 of this chapter). The Director, Postal Services Division, Bureau of Operations, Post Office Department, rules upon all applications. If he denies the application he shall notify the publisher specifying the reasons for his denial and attaching a copy of these rules. Before taking action on an application, the Director may call upon the publisher for additional information or evidence to support or clarify the application. Failure of the publisher to furnish such information or evidence may be cause for the Director to deny the application as incomplete or, on its face, not fulfilling the requirements for entry." 39 C.F.R. § 204.4.

   And it appears to be the Department's policy to utilize this provision. Riley's affidavit states at pp. 2–3:

   > "Applications which are incomplete and therefore not ready for decision are held in a 'pending' status until the applicant responds to the requests for the production of information necessary to complete the application. Until the applicant responds, no general study is made to determine what final action is to be taken. Once the information requested has been furnished and the application is complete, it is then reviewed by affiant and staff members, and after consultation with the General Counsel in appropriate cases, affiant either grants or denies the application."
   > (Emphasis added.)

7. These have second-class rates as do some 25,000 other publications, among which, as can be learned by examining what there is for all to see at any number of newsstands, are: "Esquire", "Playboy", "Gent", "Rogue", "Dude", "Whisper", "Confidential", "Top Secret", and "Hush-Hush".

   "The Bulletin", a monthly publication of The American Sunbathing Association, Inc., has also received second-class rates; it concerns itself with running advertisements and news features of particular interest to nudists, but carries no illustrations.

8. Summerfield v. Sunshine Book Co., supra, note 1, 95 U.S.App.D.C. at page 170, 221 F.2d at page 43.

port of the Postmaster General made clear that a publication is not designed primarily for advertising if it is among "[t]hose publications originated and published for the dissemination of information upon some special subject, or devoted to the interests of some special industry, having a legitimate list of subscribers and being conducted so as to attract more." Such publications, it was said, "should be regarded as equally entitled to all the benefits of the 'privileged' class as the leading metropolitan dailies of the country." (at p. 242; set forth in 28 U.S.Law Week 2425 [March 1, 1960]). The Post Office Department recently utilized this standard, holding on February 24, 1960, that a magazine published by a trailer owners' association to advance the interests of the mobile-home industry and principally financed by the sale of advertising space to trailer manufacturers and their national associations was not designed primarily for advertising purposes and so not disqualified from receiving authorization for second-class rates. The opinion mentions that "The Iron Age", "The American Grocer", and "The Northwestern Lumberman" are other trade journals authorized to use second-class rates.[9]

It is true that two of plaintiff's stockholders are stockholders in a New Jersey stock corporation, Sunshine Park, Inc., which owns real estate for a nudist community. But Sunshine Park, Inc., is not a stockholder in the plaintiff and has placed only a minimal amount of advertising in plaintiff's publications.[10] This

is hardly sufficient to base a finding that the publications consist *primarily* of material designed to create patronage for *this* nudist community.

The Court concludes that plaintiff's publications are entitled to second-class rates. The motion of the defendant is denied; the motion of the plaintiff is granted.

Counsel are requested to submit an order reflecting the above.

---

9. National Association of Trailer Owners, Inc., Docket 1/144 (February 24, 1960), 28 U.S.Law Week 2425 (March 1, 1960). A short while after counsel for plaintiff brought this decision to the attention of the Court, the Post Office Department reopened the case. National Association of Trailer Owners, Inc., Docket 1/144 (April 18, 1960), 28 U.S.Law Week 2547 (May 3, 1960). Its previous reasoning and statement, of course, still stands of record.

10. It was agreed at the oral argument that the Court should consider two recent issues of "Sunshine & Health" and two

of "Sun Magazine". Sunshine Park, Inc., has an advertisement of less than one-half of one page in each of the "Sunshine & Health" issues, which amounts to less than two per cent of the total of 36 pages (counting the covers) that each issue runs. There is no advertisement or mention of Sunshine Park, Inc., in the "Sun Magazine" issues, except for a listing in the Nudist Club Directory that each issue carries.

Other advertising—in the commonly accepted sense of paid-for publicity—constitutes less than 15% of the publications and has not exceeded that figure, at least since January, 1958.