# MANUAL ENTERPRISES, INC., ET AL. *v.* DAY, POSTMASTER GENERAL.

No. 123.   Argued February 26–27, 1962.—
Decided June 25, 1962.

*Stanley M. Dietz* argued the cause for petitioners. With him on the brief was *Edward J. Lynch.*

*J. William Doolittle* argued the cause for respondent. With him on the briefs were *Solicitor General Cox, Assistant Attorney General Orrick, John G. Laughlin, Jr.* and *David L. Rose.*

MR. JUSTICE HARLAN announced the judgment of the Court and an opinion in which MR. JUSTICE STEWART joins.

This case draws in question a ruling of the Post Office Department, sustained both by the District Court and the Court of Appeals, 110 U. S. App. D. C. 78, 289 F. 2d 455, barring from the mails a shipment of petitioners' magazines. That ruling was based on alternative determinations that the magazines (1) were themselves "obscene," and (2) gave information as to where obscene matter could be obtained, thus rendering them nonmailable under two separate provisions of 18 U. S. C. § 1461, known as the Comstock Act.[1]  Certiorari was granted (368

---

[1] Section 1461 of 18 U. S. C. provides in part:

"Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance; and—

.      .      .      .      .

"Every written or printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind giving information, directly or indirectly, where, or how, or from whom, or by what means any of

U. S. 809) to consider the claim that this ruling was inconsistent with the proper interpretation and application of § 1461, and with principles established in two of this Court's prior decisions. *Roth* v. *United States,* 354 U. S. 476; *Smith* v. *California,* 361 U. S. 147.[2]

Petitioners are three corporations respectively engaged in publishing magazines titled MANual, Trim, and Grecian Guild Pictorial. They have offices at the same address in Washington, D. C., and a common president, one Herman L. Womack. The magazines consist largely of photographs of nude, or near-nude, male models and give the names of each model and the photographer,

---

such mentioned matters, articles, or things may be obtained or made . . . .

. . . . .

"Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.

"Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section to be nonmailable, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, or knowingly takes any such thing from the mails for the purpose of circulating or disposing thereof, or of aiding in the circulation or disposition thereof, shall be fined not more than $5,000 or imprisoned not more than five years . . . ."

[2] Because of our view of the case, we need not reach petitioners' third contention that, as applied in this instance, these Post Office procedures amounted to an unconstitutional "prior restraint" on the publication of these magazines. The petitioner in this case has not questioned the Post Office Department's *general* authority under § 1461 to withhold these magazines from the mails *if* they are obscene. If that question, discussed in the opinion of MR. JUSTICE BRENNAN, *post,* p. 495, may still be deemed open in this Court, see *Milwaukee Publishing Co.* v. *Burleson,* 255 U. S. 407, 421–422 (Brandeis, J., dissenting); cf. *Hannegan* v. *Esquire, Inc.,* 327 U. S. 146, we do not think it should be decided except upon full-dress argument and briefing, which have not been afforded us here.

together with the address of the latter. They also contain a number of advertisements by independent photographers offering nudist photographs for sale.

On March 25, 1960, six parcels containing an aggregate of 405 copies of the three magazines, destined from Alexandria, Virginia, to Chicago, Illinois, were detained by the Alexandria postmaster, pending a ruling by his superiors at Washington as to whether the magazines were "nonmailable." After an evidentiary hearing before the Judicial Officer of the Post Office Department there ensued the administrative and court decisions now under review.

## I.

On the issue of obscenity, as distinguished from unlawful advertising, the case comes to us with the following administrative findings, which are supported by substantial evidence and which we, and indeed the parties, for the most part, themselves, accept: (1) the magazines are not, as asserted by petitioners, physical culture or "bodybuilding" publications, but are composed primarily, if not exclusively, for homosexuals, and have no literary, scientific or other merit; [3] (2) they would appeal to the "prurient interest" of such sexual deviates, but would not have any interest for sexually normal individuals; and (3) the magazines are read almost entirely by homosexuals, and possibly a few adolescent males; the ordinary male adult would not normally buy them.

On these premises, the question whether these magazines are "obscene," as it was decided below and argued before us, was thought to depend solely on a determina-

---

[3] The Judicial Officer found that "the publisher has admitted that the magazines are knowingly published to appeal to the male homosexual group," and that "The publisher of the issues here involved has deliberately planned these publications so that they would appeal to the male homosexual audience . . . ."

tion as to the relevant "audience" in terms of which their "prurient interest" appeal should be judged. This view of the obscenity issue evidently stemmed from the belief that in *Roth* v. *United States*, 354 U. S. 476, 489, this Court established the following *single* test for determining whether challenged material is obscene: "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." (Footnote omitted.) On this basis the Court of Appeals, rejecting the petitioners' contention that the "prurient interest" appeal of the magazines should be judged in terms of their likely impact on the "average person," even though not a likely recipient of the magazines, held that the administrative finding respecting their impact on the "average homosexual" sufficed to establish the Government's case as to their obscenity.

We do not reach the question thus thought below to be dispositive on this aspect of the case. For we find lacking in these magazines an element which, no less than "prurient interest," is essential to a valid determination of obscenity under § 1461, and to which neither the Post Office Department nor the Court of Appeals addressed itself at all: These magazines cannot be deemed so offensive on their face as to affront current community standards of decency—a quality that we shall hereafter refer to as "patent offensiveness" or "indecency." Lacking that quality, the magazines cannot be deemed legally "obscene," and we need not consider the question of the proper "audience" by which their "prurient interest" appeal should be judged.

The words of § 1461, "obscene, lewd, lascivious, indecent, filthy or vile," connote something that is portrayed in a manner so offensive as to make it unacceptable under current community *mores*. While in common usage the

words have different shades of meaning,[4] the statute since its inception has always been taken as aimed at obnoxiously debasing portrayals of sex.[5] Although the statute condemns such material irrespective of the *effect* it may

---

[4] The words of the statute are defined in Webster's New International Dictionary (unabridged, 2d ed., 1956) as follows:
*obscene*
"1. Offensive to taste; foul; loathsome; disgusting.

.        .        .        .        .

"2. a Offensive to chastity of mind or to modesty; expressing or presenting to the mind or view something that delicacy, purity, and decency forbid to be exposed; lewd; indecent; as, *obscene* language, dances, images."
*lewd*
"4. Lustful; libidinous; lascivious; unchaste . . . .
"Syn. — Licentious, lecherous, dissolute, sensual; debauched, impure; obscene, salacious, pornographic."
*lascivious*
"1. Wanton; lewd; lustful.

.        .        .        .        .

"Syn. — Licentious, lecherous, libidinous, salacious."
*indecent*
"Not decent; specif.: a Unbecoming or unseemly; indecorous . . . .
"Syn. — Immodest, impure; gross, obscene."
*filthy*
"1. Defiled with filth, whether material or moral; nasty; disgustingly dirty; polluting; foul; impure; obscene.

.        .        .        .        .

"Syn. — Squalid, unclean, gross, licentious."
*vile*
"2. Morally contaminated; befouled by or as if by sin; morally base or impure; wicked; evil; sinful . . . .
"3. . . . unclean; filthy; repulsive; odious . . . .

.        .        .        .        .

"Syn. — Cheap (despicable), debased; depraved; corrupt, sordid, vicious; disgusting, loathsome, foul." To the same effect see Webster's New International Dictionary (unabridged, 3d ed. 1961).
[5] The first federal statute bearing on obscenity was the Tariff Act of 1842 which forbade the importation of "indecent and obscene" pic-

have upon those into whose hands it falls, the early case of *United States* v. *Bennett,* 24 Fed. Cas. 1093 (No. 14571), put a limiting gloss upon the statutory language: the statute reaches only indecent material which, as now expressed in *Roth* v. *United States, supra,* at 489, "taken as a whole appeals to prurient interest." This "effect" element, originally cast in somewhat different language from that of *Roth* (see 354 U. S., at 487, 489), was taken into federal obscenity law from the leading English case of *Regina* v. *Hicklin,* [1868] L. R. 3 Q. B. 360, of which a distinguished Australian judge has given the following illuminating analysis:

> "As soon as one reflects that the word 'obscene,' as an ordinary English word, has nothing to do with corrupting or depraving susceptible people, and that it is used to describe things which are offensive to current standards of decency and not things which may induce to sinful thoughts, it becomes plain, I think, that Cockburn, C. J., in . . . *R.* v. *Hicklin* . . .

torial matter and authorized confiscation. 5 Stat. 566–567. In 1865 the Congress passed the first Postal Act touching on the mailing of obscene matter, making it a crime to deposit an "obscene book . . . or other publication of a vulgar and indecent character" in the mails. 13 Stat. 507. The reenactment of the 1865 Act in the codification of the postal laws in 1872 did not change the several adjectives describing the objectionable matter. 17 Stat. 302. The Comstock Act, 17 Stat. 598, added the descriptive terms "lewd" and "lascivious" so that the proscription then included any "obscene, lewd, or lascivious book . . . or other publication of an indecent character," but this Court in *Swearingen* v. *United States,* 161 U. S. 446, 450, held that the words "obscene, lewd or lascivious" described a single offense. In 1909 the phrase "and every filthy" as well as the word "vile" were included in the provisions of the Comstock Act, 35 Stat. 1129. In 1955 the words were arranged in their present order. 69 Stat. 183. The Court of Appeals for the First Circuit noted that the words "indecent, filthy or vile" are limited in their meaning by the preceding words "obscene, lewd, lascivious," and that all have reference to matters of sex. *Flying Eagle Publications, Inc.* v. *United States,* 273 F. 2d 799, 803.

was not propounding a logical definition of the word 'obscene,' but was merely explaining that particular characteristic which was necessary to bring an obscene publication within the law relating to obscene libel.[6] The tendency to deprave is not the characteristic which makes a publication obscene but is the characteristic which makes an obscene publication criminal. It is at once an essential element in the crime and the justification for the intervention of the common law. But it is not the whole and sole test of what constitutes an obscene libel. There is no obscene libel unless what is published is *both* offensive according to current standards of decency *and* calculated or likely to have the effect described in *R.* v. *Hicklin . . . .*" [7] *Regina* v. *Close,* [1948] Vict. L. R. 445, 463, Judgment of Fullagar, J. (Emphasis in original.)

The thoughtful studies of the American Law Institute reflect the same twofold concept of obscenity. Its earlier draft of a Model Penal Code contains the following definition of "obscene": "A thing is obscene if, considered as a whole, its predominant appeal is to

---

[6] "Obscene libel" in English usage simply means obscene material, being derived from *libellus,* "little book." See St. John-Stevas, Obscenity and the Law, 24.

[7] The passage referred to in *Regina* v. *Hicklin* was the following: "I think the test of obscenity is this, whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall. Now, with regard to this work, it is quite certain that it would suggest to the minds of the young of either sex, or even to persons of more advanced years, thoughts of a most impure and libidinous character." [1868] L. R. 3 Q. B., at 371.

The quotations from *Regina* v. *Close* and the *Hicklin* case are not intended to signify our approval of either the "tendency to deprave" or "sexual thoughts" test, but only to emphasize the two elements in the legal definition of "obscene."

prurient interest . . . *and* if it goes substantially beyond customary limits of candor in description or representation of such matters." A. L. I., Model Penal Code, Tent. Draft No. 6 (1957), § 207.10 (2). (Emphasis added.) The same organization's currently proposed definition reads: "Material is obscene if, considered as a whole, its predominant appeal is to prurient interest . . . and if *in addition* it goes substantially beyond customary limits of candor in describing or representing such matters." A. L. I., Model Penal Code, Proposed Official Draft (May 4, 1962), § 251.4 (1). (Emphasis added.) [8]

Obscenity under the federal statute thus requires proof of two distinct elements: (1) patent offensiveness; and (2) "prurient interest" appeal. Both must conjoin before challenged material can be found "obscene" under § 1461. In most obscenity cases, to be sure, the two elements tend to coalesce, for that which is patently offensive will also usually carry the requisite "prurient interest" appeal. It is only in the unusual instance where, as here, the "prurient interest" appeal of the material is found limited to a particular class of persons that occasion arises for a truly independent inquiry into the question whether or not the material is patently offensive.

The Court of Appeals was mistaken in considering that *Roth* made "prurient interest" appeal the sole test of obscenity.[9] Reading that case as dispensing with the

[8] This definition was approved by the Institute, as part of the "Proposed Official Draft," at its annual meeting in Washington, D. C., in May 1962.

[9] It is also evident that the Judicial Officer of the Post Office Department and its counsel entertained the same mistaken view of *Roth*. The Report of the Judicial Officer did not address itself directly to the inherent indecency aspect of the magazines, except to the extent that such factor was tangentially involved in the findings already summarized (*supra*, p. 481). The same is true of the expert testimony adduced by government counsel at the administrative hearing.

requisite of patently offensive portrayal would be not only inconsistent with § 1461 and its common-law background, but out of keeping with *Roth's* evident purpose to tighten obscenity standards. The Court there both rejected the "isolated excerpt" and "particularly susceptible persons" tests of the *Hicklin* case, 354 U. S., at 488–489, and was at pains to point out that not all portrayals of sex could be reached by obscenity laws but only those treating that subject "in a manner appealing to prurient interest." 354 U. S., at 487. That, of course, was but a compendious way of embracing in the obscenity standard *both* the concept of patent offensiveness, manifested by the terms of § 1461 itself, and the element of the likely corruptive effect of the challenged material, brought into federal law via *Regina* v. *Hicklin*.

To consider that the "obscenity" exception in "the area of constitutionally protected speech or press," *Roth,* at 485, does not require any determination as to the patent offensiveness *vel non* of the material itself might well put the American public in jeopardy of being denied access to many worthwhile works in literature, science, or art. For one would not have to travel far even among the acknowledged masterpieces in any of these fields to find works whose "dominant theme" might, not beyond reason, be claimed to appeal to the "prurient interest" of the reader or observer. We decline to attribute to Congress any such quixotic and deadening purpose as would bar from the mails all material, not patently offensive, which stimulates impure desires relating to sex. Indeed such a construction of § 1461 would doubtless encounter constitutional barriers. *Roth,* at 487–489. Consequently we consider the power exercised by Congress in enacting § 1461 as no more embracing than the interdiction of "obscenity" as it had theretofore been understood. It is only material whose indecency is self-demonstrating *and* which, from the standpoint of its effect, may be said

predominantly to appeal to the prurient interest that Congress has chosen to bar from the mails by the force of § 1461.

We come then to what we consider the dispositive question on this phase of the case. Are these magazines offensive on their face? Whether this question be deemed one of fact or of mixed fact and law, see Lockhart and McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn. L. Rev. 5, 114–115 (1960), we see no need of remanding the case for initial consideration by the Post Office Department or the Court of Appeals of this missing factor in their determinations. That issue, involving factual matters entangled in a constitutional claim, see *Grove Press, Inc.,* v. *Christenberry,* 276 F. 2d 433, 436, is ultimately one for this Court. The relevant materials being before us, we determine the issue for ourselves.

There must first be decided the relevant "community" in terms of whose standards of decency the issue must be judged. We think that the proper test under this federal statute, reaching as it does to all parts of the United States whose population reflects many different ethnic and cultural backgrounds, is a national standard of decency. We need not decide whether Congress could constitutionally prescribe a lesser geographical framework for judging this issue [10] which would not have the intolerable consequence of denying some sections of the country access to material, there deemed acceptable, which in others might be considered offensive to prevailing community standards of decency. Cf. *Butler* v. *Michigan,* 352 U. S. 380.

As regards the standard for judging the element of "indecency," the *Roth* case gives little guidance beyond

---

[10] The 1958 amendments to 18 U. S. C. § 1461, 72 Stat. 962, authorizing criminal prosecution at the place of delivery evince no purpose to make the standard less than national.

indicating that the standard is a constitutional one which, as with "prurient interest," requires taking the challenged material "as a whole." *Roth,* at 489. Being ultimately concerned only with the question whether the First and Fourteenth Amendments protect material that is admittedly obscene,[11] the Court there had no occasion to explore the application of a particular obscenity standard. At least one important state court and some authoritative commentators have considered *Roth* and subsequent cases [12] to indicate that only "hard-core" pornography can constitutionally be reached under this or similar state obscenity statutes. See *People* v. *Richmond County News, Inc.,* 9 N. Y. 2d 578, 175 N. E. 2d 681; Lockhart and McClure, *supra,* at 58–60. Whether "hard-core" pornography, or something less, be the proper test, we need go no further in the present case than to hold that the magazines in question, taken as a whole, cannot, under any permissible constitutional standard, be deemed to be beyond the pale of contemporary notions of rudimentary decency.

We cannot accept in full the Government's description of these magazines which, contrary to *Roth* (354 U. S., at 488–489), tends to emphasize and in some respects overdraw certain features in several of the photographs, at the expense of what the magazines fairly taken as a whole depict.[13] Our own independent examination of

---

[11] No issue was presented in *Roth* as to the obscenity of any of the materials involved. 354 U. S., at 481, n. 8.

[12] See cases cited, *infra,* p. 490.

[13] "The magazines contained little textual material, with pictures of male models dominating almost every page . . . . The typical page consisted of a photograph, with the name of the model and the photographer and occasional references to the model's age (usually under 26), color of eyes, physical dimensions and occupation. The magazines contained little, either in text or pictures, that could be

490

the magazines leads us to conclude that the most that can be said of them is that they are dismally unpleasant, uncouth, and tawdry. But this is not enough to make them "obscene." Divorced from their "prurient interest" appeal to the unfortunate persons whose patronage they were aimed at capturing (a separate issue), these portrayals of the male nude cannot fairly be regarded as more objectionable than many portrayals of the female nude that society tolerates. Of course not every portrayal of male or female nudity is obscene. See *Parmelee* v. *United States*, 72 App. D. C. 203, 206–208, 113 F. 2d 729, 732–734; *Sunshine Book Co.* v. *Summerfield*, 355 U. S. 372; *Mounce* v. *United States*, 355 U. S. 180. Were we to hold that these magazines, although they do not transcend the prevailing bounds of decency, may be denied access to the mails by such undifferentiated legislation as that before us, we would be ignoring the admonition that "the door . . . into this area [the First Amendment] cannot be left ajar; it must be kept tightly closed and opened

considered as relating in any way to weight lifting, muscle building or physical culture . . . .

"Many of the photographs were of nude male models, usually posed with some object in front of their genitals . . . ; a number were of nude or partially nude males with emphasis on their bare buttocks . . . . Although none of the pictures directly exposed the model's genitals, some showed his pubic hair and others suggested what appeared to be a semi-erect penis . . . ; others showed male models reclining with their legs (and sometimes their arms as well) spread wide apart . . . . Many of the pictures showed models wearing only loin cloths, 'V gowns,' or posing straps . . . ; some showed the model apparently removing his clothing . . . . Two of the magazines had pictures of pairs of models posed together suggestively . . . .

"Each of the magazines contained photographs of models with swords or other long pointed objects . . . . The magazines also contained photographs of virtually nude models wearing only shoes, boots, helmets or leather jackets . . . . There were also pictures of models posed with chains or of one model beating another while a third held his face in his hands as if weeping . . . ."

only the slightest crack necessary to prevent encroachment upon more important interests" (footnote omitted). *Roth,* at 488.[14]

We conclude that the administrative ruling respecting nonmailability is improvident insofar as it depends on a determination that these magazines are obscene.

## II.

There remains the question of the advertising. It is not contended that the petitioners held themselves out as purveyors of obscene material, or that the advertisements, as distinguished from the other contents of the magazines, were obscene on their own account. The advertisements were all by independent third-party photographers. And, neither with respect to the advertisements nor the magazines themselves, do we understand the Government to suggest that the "advertising" provisions of § 1461 are violated if the mailed material merely "gives the leer that promises the customer some obscene pictures." *United States* v. *Hornick,* 229 F. 2d 120, 121. Such an approach to the statute could not withstand the underlying precepts of *Roth.* See *Poss* v. *Christenberry,* 179 F. Supp. 411, 415; cf. *United States* v. *Schillaci,* 166 F. Supp. 303, 306. The claim on this branch of the case rests, then, on the fact that some of the third-party advertisers were found in possession of what undoubtedly may be regarded as "hard-core" photographs,[15] and that postal

---

[14] Since Congress has sought to bar from the mails only material that is "obscene, lewd, lascivious, indecent, filthy or vile," and it is within this statutory framework that we must judge the materials before us, we need not consider whether these magazines could constitutionally be reached under "a statute narrowly drawn to define and punish specific conduct as constituting a clear and present danger." *Cantwell* v. *Connecticut,* 310 U. S. 296, 311.

[15] A number of such photographs were seized by the police, possessing search or arrest warrants, but knowledge that these advertisers were selling, or would sell, such photographs was never brought home to any of these petitioners.

officials, although not obtaining the names of the advertisers from the lists in petitioners' magazines, received somewhat less offensive material through the mails from certain studios which were advertising in petitioners' magazines.

A question of law must first be dealt with. Should the "obscene-advertising" proscription of § 1461 be construed as not requiring proof that the publisher *knew* that at least some of his advertisers were offering to sell obscene material? In other words, although the criminal provisions of § 1461 do require *scienter* (note 1, *supra*), can the Post Office Department in civil proceedings under that section escape with a lesser burden of proof? We are constrained to a negative answer. *First,* Congress has required *scienter* in respect of one indicted for mailing material proscribed by the statute. In the constitutional climate in which this statute finds itself, we should hesitate to attribute to Congress a purpose to render a publisher civilly responsible for the innocuous advertisements of the materials of others, in the absence of any showing that he knew that the character of such materials was offensive. And with no express grant of authority to the Post Office Department to keep obscene matter from the mails (see note 2, *supra*), we should be slow to accept the suggestion that an element of proof expressly required in a criminal proceeding may be omitted in an altogether parallel civil proceeding. *Second,* this Court's ground of decision in *Smith* v. *California,* 361 U. S. 147, indicates that a substantial constitutional question would arise were we to construe § 1461 as not requiring proof of *scienter* in civil proceedings. For the power of the Post Office to bar a magazine from the mails, if exercised without proof of the publisher's knowledge of the character of the advertisements included in the magazine, would as effectively "impose a severe limitation on the public's

access to constitutionally protected matter," 361 U. S., at 153, as would a state obscenity statute which makes criminal the possession of obscene material without proof of *scienter*. Since publishers cannot practicably be expected to investigate each of their advertisers, and since the economic consequences of an order barring even a single issue of a periodical from the mails might entail heavy financial sacrifice, a magazine publisher might refrain from accepting advertisements from those whose own materials could conceivably be deemed objectionable by the Post Office Department. This would deprive such materials, which might otherwise be entitled to constitutional protection, of a legitimate and recognized avenue of access to the public. To be sure, the Court found it unnecessary in *Smith* to delineate the scope of *scienter* which would satisfy the Fourteenth Amendment. Yet it may safely be said that a federal statute which, as we construe it, requires the presence of that element is not satisfied, as the Government suggests it might be, merely by showing that a defendant did not make a "good faith effort" to ascertain the character of his advertiser's materials.

On these premises we turn to the record in this case. Although postal officials had informed petitioners' president, Womack, that their Department was *prosecuting* several of his advertisers for sending obscene matter through the mails, there is no evidence that any of this material was shown to him. He thus was afforded no opportunity to judge for himself as to its alleged obscenity. Contrariwise, one of the government witnesses at the administrative hearing admitted that the petitioners had deleted the advertisements of several photographic studios after being informed by the Post Office that the proprietors had been *convicted* of mailing obscene mate-

rial.[16]  The record reveals that none of the postal officials who received allegedly obscene matter from some of the advertisers obtained their names from petitioners' magazines; this material was received as a result of independent test checks. Nor on the record before us can petitioners be linked with the material seized by the police. Note 15, *supra.* The only such asserted connection—that "hard core" matter was seized at the studio of one of petitioners' advertisers—falls short of an adequate showing that petitioners knew that the advertiser was offering for sale obscene matter. Womack's own conviction for sending obscene material through the mails, *Womack* v. *United States,* 111 U. S. App. D. C. 8, 294 F. 2d 204, is remote from proof of like conduct on the part of the advertisers. At that time he was acting as president of another studio; the vendee of the material, while an advertiser in petitioners' magazines, had closed his own studio before the present issues were published. Finally, the general testimony by one postal inspector to the effect that in his experience advertisers of this character, after first leading their customers on with borderline material, usually followed up with "hard-core" matter, can hardly be deemed of probative significance on the issue at hand.

At best the Government's proof showed no more than that petitioners were chargeable with knowledge that these advertisers were offering photographs of the same character, and with the same purposes, as those reflected

---

[16] Grecian Guild Pictorial carried a notice that it "does not knowingly use the work of any studio which takes or sells nude, undraped front or side view photographs. The photographers listed above do not offer such photographs." To be sure this magazine, as did the others, also carried a notation that the publisher was familiar with the work of the advertisers and urged the reader to support them; but this cannot well be taken as an admission of knowledge that the advertisers' works were obscene.

in their own magazines. This is not enough to satisfy the Government's burden of proof on this score.[17]

In conclusion, nothing in this opinion of course remotely implies approval of the type of magazines published by these petitioners, still less of the sordid motives which prompted their publication. All we decide is that on this record these particular magazines are not subject to repression under § 1461.           *Reversed.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE FRANKFURTER took no part in the decision of this case.

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS join, concurring in the reversal.

I agree that the judgment below must be reversed, though for a reason different from my Brother HARLAN's. This is the first occasion on which the Court has given

---

[17] We do not think it would be appropriate at this late stage to remand the case for further proceedings on the issue of *scienter.* Although suggesting that "[it] is arguable" that *scienter* is not a necessary element under this part of the statute, the Government undertakes to defend this aspect of the judgment primarily on the premise that it was. The record shows that at the administrative hearing government counsel sought to fasten the petitioners with knowledge that the third-party advertisers were selling "obscene" material. The Judicial Officer indeed rejected the petitioners' proposed findings that "the publishers of each of the magazines in evidence . . . had no personal knowledge of the material sold by the advertisers . . . ." To be sure, the record does not disclose whether this was because "knowledge" was deemed proved rather than that such element was not considered relevant. But on the cross motions for summary judgment, based upon the administrative record, the Government did not undertake to controvert petitioners' allegations that *scienter* was a necessary element under this part of the statute.

plenary review [1] to a Post Office Department order holding matter "nonmailable" because obscene.

Petitioners, publishers of certain magazines, employ the mails in the distribution of about half of their claimed circulation of 25,000. On March 25, 1960, petitioners deposited 405 copies of their publications for transmission as second class mail from Alexandria, Virginia, to Chicago. However, the Alexandria postmaster, acting, apparently without notice to petitioners, on his belief that the magazines might be obscene and therefore "nonmailable" under 18 U. S. C. § 1461, withheld delivery and forwarded samples to the General Counsel of the Post Office Department. On April 5 and 7 that official notified petitioners not only that the magazines were being withheld from delivery because of his opinion that they were nonmailable, but also that no formal hearing would be held since an insufficient monetary value was involved. Shortly thereafter, on April 11, 1960, petitioners requested a Post Office hearing, and also sought injunctive relief in the District Court for the District of Columbia against this stoppage of their mailing. On the same day the Post Office Judicial Officer reversed the General Counsel and ordered a hearing, and thereafter the District Court refused temporary relief. On April 21, after pleadings had been filed, the hearing was begun before the Judicial Officer. On April 25 petitioners' injunction suit was dismissed on the condition that they might seek further relief if final administrative action was not forthcoming by April 28. On April 28, one month and three days after the mailing, the Judicial Officer handed down his opinion holding the magazines obscene and nonmailable, thus opening petitioners' way into court.

On May 13, petitioners filed the complaint now before us, alleging that the magazines were not obscene, that

---

[1] *One, Inc.,* v. *Olesen,* 355 U. S. 371, and *Sunshine Book Co.* v. *Summerfield,* 355 U. S. 372, were decided summarily without argument.

respondent's action in withholding them from the mails was "unlawful and inequitable . . . calculated . . . to censor and harass plaintiffs and : . . a prior restraint designed to deprive the plaintiffs of their rights under the First Amendment . . . ," and requesting temporary and permanent injunctive relief. Petitioners then moved for summary judgment, arguing, *inter alia,* that "the Post Office Department held a time-consuming hearing, the product of which was an Order contrary to the established law of the United States . . . . This amounts to the most obnoxious and unconstitutional censorship. The principal effect of the administrative hearing . . . is to delay action of this Court. . . . Plaintiffs assert that the Post Office has conducted an ex parte administrative prior restraint treading upon an area of constitutional sensitivity apart from the substantive problems of determining whether or not the magazines are obscene. . . . Further, plaintiffs argue that the entire civil procedure followed by the Post Office based upon a criminal statute raises doubts of constitutionality." Respondent, too, moved for summary judgment. His motion was granted and the complaint dismissed without opinion. The Court of Appeals affirmed, holding the magazines obscene.

In addition to the question whether the particular matter is obscene, the Post Office order raises insistent questions about the validity of the whole procedure which gave rise to it, vital to the orderly development of this body of law and its administration. We risk erosion of First Amendment liberties unless we train our vigilance upon the methods whereby obscenity is condemned no less than upon the standards whereby it is judged. *Marcus* v. *Search Warrant,* 367 U. S. 717; *Kingsley Books, Inc.,* v. *Brown,* 354 U. S. 436; see also *Smith* v. *California,* 361 U. S. 147. Questions of procedural safeguards loom large in the wake of an order such as the one before us. Among them are: (a) whether Congress can close the

mails to obscenity by any means other than prosecution of its sender; (b) whether Congress, if it can authorize exclusion of mail, can provide that obscenity be determined in the first instance in any forum except a court, and (c) whether, even if Congress could so authorize administrative censorship, it has in fact conferred upon postal authorities any power to exclude matter from the mails upon their determination of its obscene character.[2]

Lower courts and judges have been troubled by these questions,[3] but this Court has not had occasion to decide them. At least question (c) is before us now.[4] It surpasses in general significance even the important issue of the standards for judging this material's "mailability." Moreover, dealing with the case on this ground involves less constitutional difficulty than inheres in others. The conclusion that the Postmaster General is acting *ultra vires* because Congress has not granted the power which

---

[2] There would also be the question, if (a), (b) and (c) were answered affirmatively, of the validity of the particular procedures that the Post Office has employed.

[3] See, *e. g., Grove Press, Inc.,* v. *Christenberry,* 175 F. Supp. 488, 495, and 276 F. 2d 433, 435; *Sunshine Book Co.* v. *Summerfield,* 101 U. S. App. D. C. 358, 364–367, 249 F. 2d 114, 120–123 (dissenting opinion), reversed, see *supra,* n. 1. And cf. *Roth* v. *Goldman,* 172 F. 2d 788, 794–795 (concurring opinion). Compare *Stanard* v. *Olesen,* 74 S. Ct. 768 (opinion of MR. JUSTICE DOUGLAS), *Olesen* v. *Stanard,* 227 F. 2d 785; *Summerfield* v. *Sunshine Book Co.,* 95 U. S. App. D. C. 169, 221 F. 2d 42.

[4] The Government argues that petitioners "complain generally of 'an unconstitutional prior restraint,' . . . without specifying [where] the asserted vice lies . . . ." Insofar as petitioners challenge the constitutionality of § 1461 if read to impose civil restraints, their suit would be within the requirements for convening a three-judge court under 28 U. S. C. § 2282, and therefore that claim is not here. But insofar as their attack is grounded upon a claim that § 1461 is not to be construed as granting censorial power to the Post Office, § 2282 does not apply.

he here asserts, while greatly influenced by constitutional doubts, does not require a decision as to whether any establishment of administrative censorship could be constitutional. *Hannegan* v. *Esquire, Inc.*, 327 U. S. 146; *Kent* v. *Dulles*, 357 U. S. 116.[5]

Mr. Justice Holmes has said: "The United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues, and it would take very strong language to convince me that Congress ever intended to give such a practically despotic power to any one man." *Milwaukee Publishing Co.* v. *Burleson*, 255 U. S. 407, 437 (dissenting opinion).

---

[5] My Brother HARLAN states that no question is raised as to the Post Office Department's general authority under 18 U. S. C. § 1461 to withhold obscene matter from the mails. The Government asserts only that at the administrative level the petitioners made no objection to the procedure. The Government does not suggest that the challenge to the Post Office's power to act at all had to be made before the administrative body. That challenge presents a jurisdictional question and is open to the petitioners even if not initially asserted in the agency proceeding. See *United States* v. *L. A. Tucker Truck Lines, Inc.*, 344 U. S. 33, 38. And although perhaps not artfully, the petitioners did challenge the authority of the Post Office in the District Court. In their motion for summary judgment petitioners stated: "[P]laintiffs argue that the entire civil procedure followed by the Post Office based upon a criminal statute raises doubts of constitutionality. The fragile foundation on which the Post Office action rests must be kept in mind, both in dealing with the substantive obscenity question involved and in determining the proper scope of judicial review. . . . There is lacking here the kind of specific legislative direction to the administrative agency that in certain circumstances justifies judicial deference to administrative determinations." The Court of Appeals did not discuss the issue, perhaps because it had held in *Sunshine Book Co.* v. *Summerfield, supra*, n. 3, that the questioned authority exists; the Government does not suggest that petitioners failed to make their argument there. And in this Court, petitioners continue their attack and the Government, without reservation, fully defends against it.

500

Whether Congress, by its enactment or amendment of 18 U. S. C. § 1461 (a part of the Criminal Code), has authorized the Postmaster General to censor obscenity, is our precise question. The Government relies upon no other provision to support the constitutionally questionable power of administrative censorship of this material. That power is inferred from the declaration that every item proscribed in § 1461 is "nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier." Even granting that these words on their face permit a construction allowing the Post Office the power it asserts, their use in a criminal statute, their legislative history, and the contrast with the words and history of other provisions dealing with similar problems, raise the most serious doubt that so important and sensitive a power was granted by so perfunctory a provision. The area of obscenity is honeycombed with hazards for First Amendment guaranties, and the grave constitutional questions which would be raised by the grant of such a power should not be decided when the relevant materials are so ambiguous as to whether any such grant exists.

I.

The origin of § 1461 is briefly told.[6] It was the tag end of a bill drawn in 1865 to meet Post Office requests

---

[6] There is no need to consider here the history before 1865, which was highlighted by the rejection by Congress in 1836, largely on constitutional grounds, of President Jackson's request for legislation to suppress mail distribution of "incendiary" abolitionist literature. See Rogers, The Postal Power of Congress (1916); Deutsch, Freedom of the Press and of the Mails, 36 Mich. L. Rev. 703 (1938). The 1865 Senate debates referred to such action as the kind for which power should be withheld. Cong. Globe, 38th Cong., 2d Sess. 661 (1865). The Post Office occasionally seized allegedly treasonable

for various administrative changes. Its first version read:

> "That no obscene book, pamphlet, picture, print, or other publication of a vulgar and indecent character, shall be admitted into the mails of the United States; but all such obscene publications deposited in or received at any post office, or discovered in the mails, shall be seized and destroyed, or otherwise disposed of, as the Postmaster General shall direct. And any person or persons who shall deposit or cause to be deposited in any post office or branch post office of the United States, for mailing or for delivery, an obscene book, pamphlet, picture, print, or other publication, knowing the same to be of a vulgar and indecent character, shall be deemed guilty of a misdemeanor, and, being duly convicted thereof, shall, for every such offense, be fined not more than $500, or imprisoned not more than one year, or both, according to the circumstances and aggravations of the offense."

In offering this proposal, Chairman Collamer of the Senate Post Office Committee took pains to point out that it "may be liable to some objection. . . . I am not perhaps entirely satisfied with it," and Senator Reverdy

---

newspapers despite its lack of authority. See H. R. Rep. No. 51, 37th Cong., 3d Sess., pp. 3, 10 (1863).

The only noncriminal procedure authorized against obscene material before 1865 was a judicial proceeding for imported material's forfeiture. 5 Stat. 566; see *United States* v. *Three Cases of Toys*, 28 Fed. Cas. 112, No. 16,499; *Anonymous*, 1 Fed. Cas. 1024, No. 470. For a comprehensive discussion of the history and practice of censorship in the Post Office and Bureau of Customs, see Paul and Schwartz, Federal Censorship: Obscenity in the Mail (1961), and Paul, The Post Office and Non-Mailability of Obscenity: An Historical Note, 8 U. C. L. A. L. Rev. 44 (1961).

502

Johnson, concerned about postmasters breaking seals, immediately took up Chairman Collamer's suggestion that only the penal provision be adopted. Chairman Collamer, agreeing that the nonpenal clause "might be made a precedent for undertaking to give [a postmaster] a sort of censorship over the mails," said he would be as happy if it were dropped. Senator Johnson then moved to strike it: "[I]t would be establishing a very bad precedent to give authority to postmasters to take anything out of the mail." He acknowledged that much material is sent uncovered, but thought the penal provision sufficient to meet the evil. However, Senator Sherman observed:

"I would much prefer, if the Senator would be satisfied, with simply striking out the second clause of the first [sentence]. I think the prohibition against publications of this character going into the mails ought to stand. We are well aware that many of these publications are sent all over the country from the city of New York with the names of the parties sending them on the backs, so that the postmasters without opening the mail matter may know that it is offensive matter, indecent and improper to be carried in the public mails. I think, therefore, the legislative prohibition against carrying such matter when it is known to the postmasters should be left. Probably the second clause allowing him to open mail matter should be struck out . . . ."

Senator Johnson acquiesced and the bill was then passed, reading:

"That no obscene book, pamphlet, picture, print, or other publication of a vulgar and indecent character, shall be admitted into the mails of the United States; any person or persons . . . ." Cong. Globe, 38th Cong., 2d Sess. 660–661 (1865); 13 Stat. 507.

There are two possible constructions of § 1461 on the basis of this brief Senate discussion. One possibility is that short of breaking seals,[7] the postmasters could remove matter which they thought from its face or the name of its sender to be obscene. The second construction is that postmasters could remove matter but only to turn it over to the appropriate authorities as the proposed subject of a criminal prosecution—and also of course after that material had been determined, in a criminal trial of its sender, to be obscene. Support for this second construction is found not only in the brief 1865 Senate consideration itself but also in an 1888 statute amending § 1461, and enacting a section banning material with obscene matter on its face and—unlike § 1461—explicitly providing that it "shall be withdrawn from the mails under such regulations as the Postmaster-General shall prescribe." [8]

The 1865 Senate discussion is not unambiguous, but I cannot suppose that Senator Johnson—who had already noted his awareness that much obscene material was discoverable without breaking seals, and even so, his determined opposition to its being stopped—would have accepted Senator Sherman's suggestion had he understood it to mean more than that the Post Office could stop obviously questionable matter for the purpose of transmitting it to prosecuting authorities, could stop matter already held obscene if it were sent again, and could investigate matter sent by persons previously convicted and, if the matter were found violative, could present it to the prosecuting authorities. I believe this is the correct

---

[7] Congress in 1865 was undoubtedly against any power in the Post Office to break seals (see Cong. Globe, 38th Cong., 2d Sess. 660–661), and 23 years later made this explicit as to first class mail. 25 Stat. 496–497. But even that was a prohibition "out of abundant caution" and was not intended to imply any power to open mail of other classes. See 19 Cong. Rec. 8189 (1888).

[8] 25 Stat. 496, now 18 U. S. C. § 1463.

construction of the 1865 enactment. But at least it is arguably correct, and necessary if we are to avoid the section's probable constitutional infirmity [9] (see *Near* v. *Minnesota,* 283 U. S. 697; *Summerfield* v. *Sunshine Book Co.,* 95 U. S. App. D. C. 169, 221 F. 2d 42) if construed as a provision allowing the Postmaster General to exclude all matter sent by a person who had previously sent violative matter. Such an exclusion by attaint could not be justified by the "hoary dogma . . . that the use of the mails is a privilege on which the Government may impose such conditions as it chooses, [for that] has long since evaporated." *Roth* v. *United States,* 354 U. S. 476, 504 (dissenting opinion); *Hannegan* v. *Esquire, Inc.,* 327 U. S., at 156; *Speiser* v. *Randall,* 357 U. S. 513, 518.

Subsequent developments concerning the removal of matter from the mails reveal a nearly contemporaneous strong distaste for and awareness of constitutional doubts about nonjudicial censorship, such as reflects meaningfully on the ambiguity surrounding § 1461's enactment. That ambiguity has persisted throughout § 1461's history of amendment, reconsideration, and codification. In the concurrent history of Congress' handling of related problems, there has been in each instance either a clear grant of power to the Postmaster General or, for matters as inextricably intertwined with the First Amendment as obscenity, a provision for judicial rather than administrative process. Nothing is found to suggest that one should resolve the ambiguity in 1865 to find a grant of the power of administrative censorship. Compare *Lewis Publishing Co.* v. *Morgan,* 229 U. S. 288, 311.

In 1868, in considering a provision making it unlawful to deposit letters or circulars concerning lotteries, House Conferees struck a Senate proposal which would have

[9] See *Milwaukee Publishing Co.* v. *Burleson,* 255 U. S. 407, 423, 429–430 (Brandeis, J., dissenting).

authorized postmasters to remove from the mail and deposit in dead letter offices any letters or circulars thought to concern lotteries. House Postal Committee Chairman Farnsworth explained "We thought that was a dangerous power to confer upon postmasters, and therefore we have stricken it out. That section provides that it shall be unlawful to deposit in the mails . . . which we thought would be a wise provision. But we thought it would not be wise to give postmasters this extraordinary power to be exercised upon a mere suspicion." Cong. Globe, 40th Cong., 2d Sess. 4412 (1868). Opinions of the Attorney General advising as to the postmasters' authority under this lottery provision emphasized the necessity for explicit legislative authorization to warrant removal of material from the mails. Those opinions cited examples of provisions containing such express authorization but, significantly, did not include § 1461—an important omission in the light of the observation of the Attorney General that aside from the examples he gave "[i]f there are other provisions permitting a detention of letters by a postmaster, they have escaped my attention. It is believed that, at least, there are no others affecting the subject of the present inquiry." Furthermore, in describing the authorizations he did find, the Attorney General said: "It will be seen that none of these authorize what can properly be called a 'seizure' of any suspected letters by a postmaster, because, probably, he is not deemed the proper functionary to bring to trial and punishment those violating the postal laws." [10]

In 1872, § 1461 was amended as part of a codification of postal legislation. The amendment added a proscription against the mailing of "any letter upon the envelope of which, or postal card upon which scurrilous epithets

---

[10] 16 Op. Atty. Gen. 5, 6 (1878); 12 *id.*, 538 (1868); and see 12 *id.*, 399, 401 (1868).

may have been written or printed, or disloyal devices printed or engraved . . . ." 17 Stat. 302.[11] The section was further revised when the Comstock Law was enacted in 1873. 17 Stat. 598. That statute established penalties for dealing in or in any way publishing obscenity or any article of an immoral nature in areas under federal jurisdiction, expanded the list of items not to be mailed to include matter intended to aid the procuring of abortion, and banned the importation of all such items. When the bill came to the floor, Senator Casserly objected to the provision allowing customs officers to seize prohibited items: "I do not know whether it can be left to officers of the custom-house to determine with safety what kind of literature or what sort of matter is to be admitted." Cong. Globe, 42d Cong., 3d Sess. 1436 (1873). The bill was accordingly changed to authorize customs officers simply to detain the items, and then proceed in a federal court to condemn them, if the federal judge were satisfied that they must be condemned. *Id.,* at 1525. There is no suggestion that customs officers were thought to be less trustworthy than postal officers;[12] this insistence upon judicial proceedings shows plainly the congressional aversion to administrative censorship.

The Comstock bill received but scant and hasty consideration.[13] As passed, its language was susceptible of a reading which would fail to penalize the mailing of

[11] There was also a provision that any material "which may be seized or detained for violation of law shall be returned to the owner or sender of the same, or otherwise disposed of as the Postmaster-General may direct," 17 Stat. 323, but that only states what may be done with material which may be seized or detained, and our question is whether obscene material—except in the narrow circumstances already described—may be seized or detained at all. Compare pp. 511–512, *infra.*

[12] But see Casserly's second statement, *id.,* at 1436, which was a misunderstanding of the bill.

[13] See Paul, *supra,* n. 6, at 51–57.

obscene or indecent *literature,* and reach only actual abortifacients. Closing this inadvertent gap was the sole purpose [14] of an 1876 amendment, 19 Stat. 90, which made several language changes; among them, the substitution of the words of which the Government makes so much— "declared to be non-mailable matter, [which] shall not be conveyed in the mails, nor delivered from any post-office nor by any letter-carrier"—for the more cursory "[which] shall [not] be carried in the mail." Moreover, the 1876 discussion evinces the understanding that the only obscene materials removable by the Post Office were those which were to be submitted as, or which already had been, the subject of a criminal prosecution. The manager of the amendment assured the House: "Nor, sir, does this bill give any right to any postmaster to open or to interfere with anybody's mail. It is like anything else, before you can convict, you must offer and make proof." During the debate a different speaker said: "Whenever a jury in any locality in the country shall find that a paper contains matter which may be devoted to a purpose which they deem immoral—not only indecent, but immoral—the jury may convict the man who sends

---

[14] The bill's manager in the House said: "[T]he proposed bill in no wise changes the law as it now is except to provide a penalty for the circulation of obscene literature. By an oversight in drafting the original section the penalty applies only to the disposition of articles circulated or sold for the purpose of procuring abortion or preventing conception. Already this obscene class of matter spoken of in the other portion of the section is prohibited from passing through the mails, but no penalty is provided. . . . [I]t in no way changes the section as it now is. It makes nothing non-mailable that is not now non-mailable. It merely provides a penalty. . . ." 4 Cong. Rec. 695 (1876).

"Section [1461] is perfected by the bill so as to provide a complete penalty for the mailing of all kinds of matter therein prohibited to pass through the mails." 4 Cong. Rec. 3656. The Senate did not discuss this change. See 4 Cong. Rec. 4261–4264.

the paper or the man who receives it by mail, and the postmaster is authorized to exclude that newspaper from the mail." A third speaker, in urging that the word "scurrilous" be removed, warned: "I do not object to the purification of the mails, but I would like the committee when they reconsider this bill not to go too far in giving postmasters discretion." Another Congressman feared that the severity of the penalties would make the law a dead letter, because judges and juries would be unwilling to convict. Thus the tenor of the entire debate reflected the premise that § 1461 had only a criminal application. No one suggested that it also authorized administrative censorship. 4 Cong. Rec. 695–696.[15] And see 8 Cong. Rec. 697 (1879).

---

[15] Discussion in the Senate included the first reference to the problem of standards of obscenity—it was hardly such as to afford guidelines for administrative action:

"Mr. MORTON. Mr. President, in prohibiting the transmission of any matter through the mails there ought to be great care used and it ought to be particularly described and defined. All of that which is described in the beginning of the first section of this bill is eminently proper to prohibit from being transmitted through the mails; but there is a part of that section that I think is vague and susceptible of abuse. It prohibits the transmission through the mail of 'every article or thing intended or adapted for any indecent or immoral use.' What is an 'immoral use?' That question may be subject to very different opinions. The word 'obscene' is well defined; we can understand what that means; but when you prohibit everything that is for an immoral use, there would be wide differences of opinion on that point.

"Mr. CONKLING. The same words are in the law now.

"Mr. MORTON. That may be. I remember a time when certain newspapers and pamphlets were prohibited from going through the mails in certain States, because they were held to be of an immoral and seditious character—of 'an incendiary character,' as my friend from Ohio [Mr. SHERMAN] suggests. Public opinion has changed upon that point. But when we come to prohibit the transmission of any matter through the mails, we ought to understand pretty well what it is. There are many things that a portion of our people would con-

Especially significant in pointing up the purely penal application of § 1461 are the legislative events of 1888. An amendment of but a few months' duration changed the law on such postal crimes as counterfeiting money orders. It included a provision penalizing the mailing of any matter upon the envelope or outside cover of which was indecent, scurrilous, threatening, etc., language.[16] The provision was promptly amended in the same session because "there was a suspicion that an implied power was given to postmasters to open letters. Of course there was no such intention, and this [new] bill eliminates that objectionable feature . . . ." 19 Cong. Rec. 8189.[17]

But even more significantly, the new enactment transferred to a new section, § 1463, 25 Stat. 496, the ban of § 1461 which, in the 1876 version (19 Stat. 90), had reached "every letter upon the envelope of which, or postal card upon which, indecent, lewd, obscene, or lascivious delineations, epithets, terms, or language may be written or printed"; and § 1463, instead of merely

---

sider immoral that other portions would consider entirely moral. Some people might consider a pack of cards highly immoral; others might think they were entirely proper. Many other things might be enumerated." 4 Cong. Rec. 4263.

[16] "And all matter otherwise mailable by law upon the envelope or outside cover or wrapper of which, or postal card, upon which indecent, lewd, lascivious, obscene, libelous, scurrilous, or threatening delineations, epithets, terms, or language, or reflecting injuriously upon the character or conduct of another, may be written or printed, are hereby declared to be non-mailable matter, and shall not be conveyed in the mails, nor delivered from any post-office nor by any letter-carrier; and any person who shall knowingly deposit . . . ." 25 Stat. 188.

The proscription of scurrilous epithets had been part of § 1461 as amended in 1873, 17 Stat. 599, but it was removed in 1876 when the word's breadth and vagueness were objected to. Its reenactment was largely aimed at a "blackmailing" process for the collection of debts. 19 Cong. Rec. 2206, 6734, 7662 (1888).

[17] But see also *id.*, at 6733–6734.

declaring that the listed matter was nonmailable and was not to be conveyed or delivered, provided that those items *"shall be withdrawn from the mails under such regulations as the Postmaster-General shall prescribe . . . ."* It is strange, I think, that § 1461—amended at the same time as § 1463 was enacted—was not amended also to include an explicit provision for withdrawal from the mails, if authority for withdrawal had been Congress' intention. But Congress did not contemplate any general administrative censorship of obscenity. The House discussion expressed the agreement that besides the power to punish, there should be no more than the most limited Post Office power to stop mail—and § 1463 states that limitation; and the Senate debate, focusing almost entirely upon how severe the penalties should be, reinforced the restrictions upon the postmasters and underlined that § 1461 is exclusively penal. See 19 Cong. Rec. 7660–7662, 8189.

The last congressional dealing with § 1461 which is pertinent to our inquiry occurred in 1909, when again that section was amended, this time to bar more abortifacients and "every letter, packet, or package, or other mail matter containing any filthy, vile, or indecent thing." [18] Though committee reports are unenlightening, the House discussion makes plain that the changes were intended to reverse the limitations stated in *Swearingen* v. *United States,* 161 U. S. 446, that the statute applied only to "that form of immorality which has relation to sexual impurity," and that its words had "the same meaning as is given them at common law in prosecutions for obscene libel." 161 U. S., at 451; 42 Cong. Rec. 995–999, 43 Cong. Rec. 283–284.[19] The two brief House discussions suggest that there were members who did believe that

---

[18] 35 Stat. 1129.

[19] See *United States* v. *Limehouse,* 285 U. S. 424.

the Post Office had some power to remove obscene mail, even apart from presenting it for criminal prosecution; it was analogized to fraudulent matter. But nothing characterizes the discussion so much as its ambiguity, and its concern lest the Post Office acquire powers whose exercise would amount to censorship. See 42 Cong. Rec. 995–998. And see 101 Cong. Rec. 3804, 7798, 8241–8242 (1955).

## II.

Section 1463 is not the only statute which goes further than § 1461 towards authorizing Post Office censorship. Five other criminal statutes prohibiting the introduction of various matter into the mails either contain within themselves or have direct counterparts in the postal laws which contain explicit authorizations to the Postmaster General to remove or return such matter.[20] In sharp

---

[20] (1) 18 U. S. C. § 1718, the criminal provision against mailing of matter libelous on its face, explicitly empowers the Postmaster General to make regulations governing its withdrawal from the mails; (2) 18 U. S. C. §§ 1341 and 1302, the criminal mail fraud and lottery provisions, have a matching section in the postal laws empowering the Postmaster General, upon evidence satisfactory to him, to mark mail "fraudulent" or "lottery mail" and to return it to its sender, 39 U. S. C. (Supp. II) § 4005; (3) 18 U. S. C. § 1342, making it a crime to conduct a fraudulent scheme by using a false name or address, also has a counterpart civil section empowering the Postmaster General, upon evidence satisfactory to him, to require proof of identity or to send such mail to the dead letter office, 39 U. S. C. (Supp. II) § 4003; (4) 18 U. S. C. §§ 1715 and 1716, making criminal the mailing of firearms and injurious articles, explicitly state that the Postmaster General may make regulations governing their transmission; (5) 18 U. S. C. § 1717, making criminal the mailing of matter advocating treason, explicitly authorized employees of the dead letter office to open such mail. See 74 Stat. 708. And see 7 U. S. C. § 150cc and 33 Stat. 1270 (plant pests); 38 Stat. 1113 (plants and plant products); 22 U. S. C. § 618 (foreign agents' propaganda advocating violent disorder in any other American republic); compare 7 U. S. C. § 1575 (false advertising of seed); 15 U. S. C. §§ 77q (fraudulent mat-

contrast, § 1461—itself silent as to sanctions except for the provision of criminal penalties—has no counterpart in the postal laws. It is mentioned once in the recodification of 1960—in § 4001 (a), a section collecting the various provisions designating matter as nonmailable and which, the Committee Report indicates and the floor discussion and reviser's note assure, was not intended to change existing law [21]—ambiguous throughout.

The removal of obscene material has not been the Post Office's only weapon against it. In 1950, § 4006 was enacted granting special powers over the mail of any person found, to the Postmaster General's satisfaction, to be using the mails to obtain money for or to be providing information about any obscene or vile article or thing: Postmasters could mark mail sent *to* that person "unlawful" and return it to its sender; and they could forbid payment to that person of any money orders or postal notes, and return the funds to the senders.[22] The clarity of the grant of these powers is no less noteworthy than their subsequent history. In 1956 the Postmaster General sought[23] and obtained the power to enter an order, pending the administrative proceeding to determine whether § 4006 should be invoked, under which all mail

ter regarding securities), 80a–20 (solicitation of proxies), 80a–24 (sales literature regarding securities), 80b–3, 80b–5 and 80b–6 (investment advisers' materials) ; 50 U. S. C. § 789 (publications of registered Communist organizations).

See *American School of Magnetic Healing* v. *McAnnulty,* 187 U. S. 94, 109.

[21] H. R. Rep. No. 36, 86th Cong., 1st Sess. A44 (1959) ; 105 Cong. Rec. 3157 (1959) and 106 Cong. Rec. 15,667 (1960) ; and see *supra,* n. 11.

[22] 64 Stat. 451, now revised and codified as 39 U. S. C. (Supp. II) § 4006. See 74 Stat. 578, 655.

[23] It appears that between 1950 and 1956, the Postmaster General asserted, and some courts agreed, that he already had the power. See *Stanard* v. *Olesen, supra,* n. 3, at 771.

addressed to the respondent could be impounded. The order was to expire at the end of 20 days unless the Postmaster General sought, in a Federal District Court, an order continuing the impounding. The 20-day order by the Postmaster General, and its extension by a court, were to issue only if "necessary to the effective enforcement of [§ 4006]." [24] In 1959, extensive hearings were held in the House on the Post Office's request that the 20-day period be extended to 45 days, and that the standard of necessity be changed to "public interest." [25] Instead, what was enacted in 1960 stripped the Postmaster General of his power to issue an interim order for any period, and directed him to seek a temporary restraining order in a Federal District Court. [26]

---

[24] 70 Stat. 699.

[25] Hearings before House Subcommittee on Postal Operations of the Committee on Post Office and Civil Service on Obscene Matter Sent through the Mail, 86th Cong., 1st Sess. (1959).

[26] 74 Stat. 553. The codification of the postal laws, later in 1960, repealed 70 Stat. 699 (see 74 Stat. 708, 729) and not 74 Stat. 553, but the new § 4007 (74 Stat. 655) repeats the words of 70 Stat. 699. We need not now decide which is the governing provision.

The Senate Report in 1956 had said this:

"The committee recognizes that even in its present form the bill gives the Postmaster General extraordinary and summary powers to impose a substantial penalty by impounding a person's mail for up to 20 days in advance of any hearing or any review by the courts. Such power is directly contrary to the letter and spirit of normal due process, as exemplified by the Administrative Procedure Act, which requires a hearing before any penalty may be imposed. The Post Office Department has made its case for this legislation on the grounds that a temporary and summary procedure is required to deal with fly-by-night operators using the mails to defraud or to peddle pornography, who may go out of business—or change the name of their business or their business address—before normal legal procedures can be brought into operation. The Post Office Department has not recommended, nor does this committee approve, the use of the temporary impounding procedure. under this bill as a substitute for the normal practice of an advance hearing or the bringing of an indict-

Congress gave full consideration to censorship of obscene material when it dealt with the Tariff Act of 1930. Prior to that year, the customs laws provided for the exclusion from the United States of obscene written matter, but required resort in the first instance to a Federal District Court for a determination of the matter's obscenity.[27] In the course of their work on the bill, the House Ways and Means Committee added language to exclude seditious as well as obscene material, and also replaced the judicial procedure with the generally applicable procedures for seizure by the customs officers, entailing judicial review only at the instance of a would-be importer. See H. R. Rep. No. 7, 71st Cong., 1st Sess., at 160, 185, 190, 244–245. It was in this form that the bill passed the House, and was reported by the Senate Committee, see S. Rep. No. 37, 71st Cong., 1st Sess. 60; 71 Cong. Rec. 4458 (remarks of Senator Smoot), but on the Senate floor it ran into strong expressions against customs censorship: fears about administrative determinations were enhanced by felt difficulties in applying the

---

ment for violation of the criminal code in all cases involving legitimate and well-established business operations. The committee would not approve the use of the extraordinary summary procedure under the bill against legitimate publishers of newspapers, magazines, or books in cases in which a Postmaster General might take objection to an article, an issue, or a volume." S. Rep. No. 2234, 84th Cong., 2d Sess. 2–3.

[27] Section 305 of the Tariff Act of 1922, 42 Stat. 937, banned obscene and immoral matter, but subsection (c) provided:

"That any district judge . . . within the proper district . . . [may issue upon probable cause, conformably to the Constitution], a warrant directed to [a marshal or customs officer], directing him to . . . seize . . . any article or thing mentioned in [§ 305], and to make due and immediate return thereof, to the end that the same may be condemned and destroyed by proceedings, which shall be conducted in the same manner as other proceedings in the case of municipal seizure, and with the same right of appeal or writ of error." And see *supra*, n. 6; *supra*, pp. 505–506.

statute's proscriptions to particular material. Judicial review was thought insufficient, for that would leave the initiative for resort to the courts with the person subjected to the censorship: expense, inconvenience, and public embarrassment would, it was believed, result in unreviewed administrative exclusion. See generally 71 Cong. Rec. 4432–4439; 4445–4471. In support of the idea that the initial decision should be made by a court rather than a customs inspector, 72 Cong. Rec. 5417–5423, Senator Walsh of Montana said:

> "Everybody of right mind wants to prevent the circulation of such books as the Senator from Utah has in mind. That is not the point at all. Those immoral and obscene and indecent publications are printed in this country, as well as abroad. . . . How do we reach the situation? We make it a crime to circulate those books in this country, and we punish that offense the same as we punish every other offense, by proper prosecution. Likewise, we prohibit the circulation of material of that kind in the mails, and if anybody circulates it in the mails he becomes liable to indictment and prosecution. That is the way we endeavor to deal with that thing." 72 Cong. Rec. 5419. See also *id.*, at 5425, 5430. But compare the remarks of Senators Copeland, Cutting, and Fletcher, 71 Cong. Rec., at 4435, 4450.

He then offered an amendment to impose criminal sanctions for importing proscribed matter, and to require the matter's detention by the customs for transmittal to the appropriate authorities to commence judicial forfeiture proceedings. *Id.*, at 5421. However, there were misgivings about the criminal sanction; it was thought by some to jeopardize borderline activity too seriously. *Id.*, at 5423–5431. The Senate passed a provision corresponding to Senator Walsh's amendment, but without

a criminal sanction, 72 Cong. Rec. 5501–5520, and this was enacted into law. Thus the House Committee's attempt to revert from judicial to administrative determinations in the initial phase of customs censorship was emphatically rebuffed.

## III.

It is clear that the Post Office has long practiced administrative censorship of allegedly obscene mailings generally. However, the formal regulations prescribing a procedure are new.[28] The practice was described in 1952 by the Solicitor of the Department when testifying before a congressional committee:

> "[W]e have an informal procedure, which, so far, hasn't been considered or tested out in the court, so we have gotten by with it so far. That is where a postmaster finds obscene matter at the point of entry of the mail into the post office, and if he is in doubt as to whether it is good or bad he will send it to the Solicitor's office for a ruling. . . ."

He also said:

> "If we had to hold hearings on all of those, if any court should ever decide that those hearings also come under the Administrative Procedure Act, we are just hopelessly sunk, that is all; we are just lost.
>
> "They may, but they have never taken us into court on it. We just hope that we get by with it as long as we can." [29]

---

[28] These date from 1957. See 39 CFR §§ 14.4, 203 (1962).

[29] See *Wong Yang Sung* v. *McGrath,* 339 U. S. 33; *Riss & Co.* v. *United States,* 341 U. S. 907; *Cates* v. *Haderlein,* 342 U. S. 804; *Walker* v. *Popenoe,* 80 U. S. App. D. C. 129, 149 F. 2d 511; *Door* v. *Donaldson,* 90 U. S. App. D. C. 188, 195 F. 2d 764. And see, *supra,* n. 23.

And:

"[S]ometimes you can get five people together, and you can give them five pieces of mail, and ask them to mark them, and you will get five different results, because in some cases it is just one of those things that depends on your own personal ideas and your own bringing up; it depends upon how strongly you feel about things, and there are some types of that material that you just can't get two people to agree on no matter how reasonably and how objectively they look upon it. It is just an honest difference of opinion. We experience it all the time, so we have our conferences, and we decide what is going to be the best thing to do. . . .

. . . . .

"We have no trouble with prosecutions on things that are definitely obscene, but it is this material that is this way and that way that is very, very difficult to prosecute." Hearings before the Select Committee on Current Pornographic Materials, House of Representatives, on Investigation of Literature Allegedly Containing Objectionable Material, 82d Cong., 2d Sess. 281, 282 (1952).

It also is clear that this was not the first or last occasion on which Post Office practice has been brought to the attention of a congressional committee.[30] But the report

---

[30] See, e. g., Hearings before House Subcommittee No. 8 of the Committee on the Post Office and Post Roads on H. R. 5370, 74th Cong., 1st Sess (1935); and Hearings, supra, n. 25; S. Rep. No. 2179, 81st Cong., 2d Sess. (1950); S. Rep. No. 113, 84th Cong., 1st Sess. (1955); Attorney General's Committee on Administrative Procedure, Post Office Department (1940); 19 Op. Atty. Gen. 667 (1890) (upholding exclusion from the mails of allegedly obscene portions of Tolstoi's "Kreutzer Sonata"); 4 Op. Asst. Atty. Gen., Post-Office Dept. 741 (1908) (holding that § 1461 is a civil as well

of the 1952 Select Committee, which listed § 1461 as a criminal statute, certainly did not dispel the continuing ambiguity surrounding that section. And the report said:

> "There are other means of handling this problem than by the ban of the censor, means which can be applied without danger of infringing on the freedom of the press . . . ." [31]

But, in any event, testimony before committees, committee reports, and administrative usurpation, do not, either singly or collectively, suffice to establish authorization.

## IV.

We have sustained the criminal sanctions of § 1461 against a challenge of unconstitutionality under the First Amendment. *Roth* v. *United States*, 354 U. S. 476. We have emphasized, however, that the necessity for safeguarding First Amendment protections for nonobscene materials means that Government "is not free to adopt whatever procedures it pleases for dealing with obscenity . . . without regard to the possible consequences for constitutionally protected speech." *Marcus* v. *Search Warrant*, 367 U. S. 717, 731. I imply no doubt that

---

as a criminal provision, and that the Post Office "in passing upon the mailability of matter under this statute . . . is not confined to the strict construction of the terms of the enactment which must be followed by a court in determining whether in a criminal case its provisions have been violated"). And see the sharp—and constitutionally colored—opposition to and rejection of a 1915 proposal that would have authorized the Postmaster General to close the mails to material sent by a person he had determined to be engaged in publishing obscene matter. Hearings before House Committee on the Post Office and Post Roads on *Exclusion of Certain Publications from the Mails*, 63d Cong., 3d Sess. (1915); *Milwaukee Publishing Co.* v. *Burleson*, 255 U. S. 407, 424 (Brandeis, J., dissenting).

[31] H. R. Rep. No. 2510, 82d Cong., 2d Sess. 5, 32.

Congress could constitutionally authorize a noncriminal process in the nature of a judicial proceeding under closely defined procedural safeguards. But the suggestion that Congress may constitutionally authorize any process other than a fully judicial one immediately raises the gravest doubts. However, it is enough to dispose of this case that Congress has not, in § 1461, authorized the Postmaster General to employ any process of his own to close the mails to matter which, in his view, falls within the ban of that section. "The provisions . . . would have to be far more explicit for us to assume that Congress made such a radical departure from our traditions and undertook to clothe the Postmaster General with the power to supervise the tastes of the reading public of the country." *Hannegan* v. *Esquire, Inc.*, 327 U. S., at 156. I, therefore, concur in the judgment of reversal.

MR. JUSTICE CLARK, dissenting.

While those in the majority like ancient Gaul are split into three parts, the ultimate holding of the Court today, despite the clear congressional mandate found in § 1461, requires the United States Post Office to be the world's largest disseminator of smut and Grand Informer of the names and places where obscene material may be obtained. The Judicial Officer of the Post Office Department, the District Court, and the Court of Appeals have all found the magazines in issue to be nonmailable on the alternative grounds that they are obscene and that they contain information on where obscene material may be obtained. The Court, however, says that these magazines must go through the mails. Brother HARLAN, writing for himself and Brother STEWART, finds that the magazines themselves are unobjectionable because § 1461 is not so narrowly drawn as to prohibit the mailing of material "that incites immoral sexual conduct," and that the presence of information leading to obscene material does not taint

the magazines because their publishers were unaware of the true nature of this information.  Brother BRENNAN, joined by THE CHIEF JUSTICE and Brother DOUGLAS, finds that § 1461 does not authorize the Postmaster General through administrative process to close the mails to matter included within its proscriptions.  Since in my view the Postmaster General is required by § 1461 to reject nonmailable matter, I would affirm the judgment on the sole ground that the magazines contain information as to where obscene material can be obtained and thus are nonmailable.  I, therefore, do not consider the question of whether the magazines as such are obscene.

I.

The procedures followed below can be described briefly. Petitioners deposited in the Post Office in Alexandria, Virginia, six parcels containing 405 copies of three magazines which they published.  The parcels were directed to petitioners' agent in Chicago and marked as second class matter.  Being unsealed and subject to inspection,[1] the Postmaster noticed that the material appeared to be obscene.  Under the regulations of the Post Office Department in effect since 1902, the Alexandria Postmaster notified the General Counsel of the Post Office Department in Washington and submitted samples of the material; the General Counsel determined the magazines to be nonmailable under § 1461 and notified petitioners' president.  Petitioners sought injunctive relief against the Department in the District Court on the grounds that the magazines did not violate § 1461 and the procedure used amounted to an unconstitutional "ex parte administrative prior restraint," but the suit was dismissed for determination of the issue at an administrative hearing provided for by the Department's regulations.  After a full

---

[1] 39 U. S. C. (Supp. II) § 4058.

hearing, at which petitioners did not dispute the congressional authorization to reject the six parcels for second class mailings, the Judicial Officer declared the material nonmailable. Petitioners contested this finding by judicial review in the District Court, where the action of the Judicial Officer was upheld.

MR. JUSTICE BRENNAN, as I have indicated, has reached the conclusion that when the Congress originally passed the Act in question some 97 years ago it granted no power to the Post Office to refuse to receive and carry matter declared by the Act to be nonmailable. Since this point was neither presented below nor argued here, I do not believe it to be properly before us. Brother BRENNAN, however, rests his concurring opinion on it and for that reason I shall discuss the issue.[2]

Section 1461 explicitly provides that:

"Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance; and . . . [e]very written or printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind giving information, directly or indirectly, where, or how, or from whom, or by what means any of such mentioned matters, articles, or things may be obtained . . . [i]s *declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.*" (Emphasis supplied.)

Its genesis was in Section 16 of the Act of March 3, 1865, 13 Stat. 507, which when reported in the Senate had two parts:

"[N]o obscene book, pamphlet, picture, print, or other publication of a vulgar and indecent character, shall be admitted into the mails of the United States;

---

[2] I agree with the conclusion in that opinion that petitioners' constitutional claim cannot be considered here.

522

but all such obscene publications deposited in or received at any post office, or discovered in the mails, shall be seized and destroyed, or otherwise disposed of, as the Postmaster General shall direct."

"[A]ny person or persons who shall deposit or cause to be deposited in any post office or branch post office of the United States, for mailing or for delivery, an obscene book, pamphlet, picture, print, or other publication, knowing the same to be of a vulgar and indecent character, shall be deemed guilty of a misdemeanor . . . ." Cong. Globe, 38th Cong., 2d Sess. 661.

The sponsor of the bill advised the Senate that it had a twofold effect: "The first part of it provides that if such [obscene] publications are in the mails the postmasters may take them out; and the latter part provides a penalty and a punishment for those who put them into the mails." This explanation of the sponsor seems enough to undermine Brother BRENNAN's contention, but there is even more. Senator Johnson of Maryland apparently feared that obscene matter might be mailed in sealed envelopes and that "the postmaster . . . will break the seal." He moved to strike out the first part of the bill. Senator Sherman, however, objected, saying that *the legislative prohibition against carrying such matter when it is known to the postmasters should be left.* Probably the second clause allowing him to open mail matter should be struck out." *Ibid.* (Emphasis supplied.) Senator Johnson acquiesced in this suggestion, and thus the bill as finally passed clearly permitted postmasters to refuse matters which were known by them to be obscene, so long as seals were not broken.[3]

---

[3] The magazines here involved were second class matter and thus were unsealed and subject to inspection. *39 U. S. C.* (Supp. II) § 4058.

The 1873 postal regulations reflected this power to exclude obscene matter from the mails,[4] as have all succeeding ones, *e. g.*, Postal Laws and Regulations (1893 ed.) § 335. In 1876 the Act was amended to substantially its present form. 19 Stat. 90. It not only declared certain material "to be non-mailable matter" but added that such "shall not be conveyed in the mails, nor delivered from any post-office nor by any letter-carrier." A single comment by the bill's sponsor in the House reflects the understanding that this section, both before and after amendment, authorized exclusion:

> "[T]he proposed bill in no wise changes the law as it now is except to provide a penalty for the circulation of obscene literature. By an oversight in drafting the original section the penalty applies only to the disposition of articles circulated or sold for the purpose of procuring abortion or preventing conception. *Already this obscene class of matter spoken of in the other portion of the section is prohibited from passing through the mails,* but no penalty is provided. . . . [I]t in no way changes the section as it now is. It makes nothing non-mailable that is not now non-mailable. It merely provides a penalty. . . ." 4 Cong. Rec. 695 (1876). (Emphasis supplied.)

Regulations establishing the procedure now used by the Department to determine questions of mailability were adopted in 1902. And in 1960 in a recodification the Congress included § 1461 within its collection of provisions which designate matter as nonmailable. 39 U. S. C. (Supp. II) § 4001 (a).

---

[4] "All books, pamphlets, circulars, prints, &c., of an obscene, vulgar, or indecent character . . . *must be withdrawn from the mails* by postmasters at either the office of mailing or the office of delivery." Postal Laws and Regulations (1873 ed.) § 88. (Emphasis supplied.)

In light of the language of the statutes, the legislative history, the subsequent recodification and the consistent history of administrative interpretation, it stretches my imagination to understand how one could conclude that Congress did not authorize the Post Office Department to exclude nonmailable material. As Justice Brandeis said in *Milwaukee Publishing Co.* v. *Burleson,* 255 U. S. 407, 418, 421 (1921) (dissenting opinion):

> "The scope of the Postmaster General's alleged authority is confessedly the same whether the reason for the nonmailable quality of the matter inserted in a newspaper is that it violates the Espionage Act, or the copyright laws, or that it is part of a scheme to defraud, or concerns lotteries, or is indecent, or is in any other respect matter which Congress has declared shall not be admitted to the mails.

> . . . . .

> "As a matter of administration the Postmaster General, through his subordinates, rejects matter offered for mailing, or removes matter already in the mail, which in his judgment is unmailable. The existence in the Postmaster General of the power to do this cannot be doubted. The only question which can arise is whether in the individual case the power has been illegally exercised."

## II.

Let us now turn to the opinion of Brother HARLAN and first take up the question whether magazines which indisputably contain information on where obscene material may be obtained can be considered nonmailable apart from the sender's scienter. Giving regard to the wording of § 1461, the interests involved, and the nature of the sanction imposed, I fail to see how the sender's scienter is anywise material to a determination of nonmailability.

Section 1461 very explicitly demands that no information "be conveyed in the mails or delivered from any post office or by any letter carrier" if it in fact tells how obscene material can be obtained. This command running to those charged with the administration of the postal system is not conditioned by the words of the statute upon the sender's scienter or any remotely similar consideration. When it wants to inject a scienter requirement, the Congress well knows the words to use, as evidenced by the very next sentence in § 1461 establishing the criminal sanctions: "Whoever *knowingly* uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section to be nonmailable . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both . . . ." (Emphasis supplied.) Congress could not have made it more clear that the sender's knowledge of the material to be mailed did not determine its mailability but only his responsibility for mailing it. Nor is there any reason why Congress—in a civil action— should have wanted it any other way. The sender's knowledge of the matter sought to be mailed is immaterial to the harm caused to the public by its dissemination. Finally, interpreting § 1461 to mean what it says would not give rise to the "serious constitutional question" envisioned. This fear is premised entirely on *Smith* v. *California,* 361 U. S. 147 (1959), which was a criminal case. Surely the prerequisites to criminal responsibility are quite different from the tests for the use of the mails. The present determination of nonmailability of bulk packages of magazines to newsstands rains no sanctions or incriminations upon the publishers of these magazines nor does it confiscate or impound the magazines. For these reasons, I believe the only possible interpretation of § 1461 is that the sender's scienter is immaterial in determining the mailability of information on where obscene material can be obtained.

In passing, it might be noted that a requirement of scienter gives rise to some interesting problems. For instance: Is the sender's scienter permanently fixed at the time the material is first unsuccessfully offered for mailing, or is his scienter to be re-evaluated when the material is again offered for mailing? How are equitable principles such as "clean hands" and "he who seeks equity must do equity" squared in a proceeding to enjoin an administrative non-mailable order with an insistence on mailing material which has been shown to contain information leading to obscene material?

However, assuming that the knowledge of the sender is material in determining the mailability of these magazines, I submit the undisputed facts and findings compel as a matter of law the conclusion that the petitioners knew that materials published in their magazines informed their readers where obscene matter might be obtained. To say the least, these facts and findings are such that this Court ought not to set itself up as a fact-finder but should remand the case for a determination by those who have been entrusted initially with this responsibility.[5]

The content and direction of the magazines themselves are a tip-off as to the nature of the business of those who solicit through them. The magazines have no social, educational, or entertainment qualities but are designed solely as sex stimulants for homosexuals. They "consist almost entirely of photographs of young men in nude or practically nude poses handled in such a manner as to focus attention on their genitals or buttocks or to emphasize

---

[5] If the express rejection by the Judicial Officer of petitioners' proposed finding that they had "no personal knowledge of the material sold by the advertisers" is taken as a finding to the contrary, then of course this is entitled to the deference accorded administrative findings, cf., e. g., *Labor Board* v. *Walton Mfg. Co.*, 369 U. S. 404 (1962).

these parts . . . ." Because of this content the magazines do "not appeal to the ordinary male adult, . . . [who] would have no interest in them and would not buy them under ordinary circumstances and . . . [therefore] the readers of these publications consist almost entirely of male homosexuals and possibly a few adolescent males . . . ." The publishers freely admit that the magazines are published to appeal to the male homosexual group. The advertisements and photographer lists in such magazines were quite naturally "designed so as to attract the male homosexual and to furnish him with names and addresses where nude male pictures in poses and conditions which would appeal to his prurient interest may be obtained." Moreover, the advertisements themselves could leave no more doubt in the publishers' minds than in those of the solicited purchasers. To illustrate: some captioned a picture of a nude or scantily attired young man with the legend "perfectly proportioned, handsome, male models, age 18–26." Others featured a photograph of a nude male with the area around the privates obviously retouched so as to cover the genitals and part of the pubic hair and offered to furnish an "original print of this photo." Finally, each magazine specifically endorsed its listed photographers and requested its readers to support them by purchasing their products. In addition, three of the four magazines involved expressly represented that they were familiar with the work of the photographers listed in their publications.[6]

Turning to Womack, the president and directing force of all three corporate publishers, it is even clearer that we are not dealing here with a "Jack and Jill" operation. Mr. Womack admitted that the magazines were planned for homosexuals, designed to appeal to and stim-

---

[6] The magazines were offered in six bundles, apparently with copies of each of the four magazines intermingled among the bundles.

528

ulate their erotic interests. To improve on this effect, he made suggestions to photographers as to the type of pictures he wanted. For example, he informed one of the studios listed in his publications that "physique fans want their 'truck driver types' already cleaned up, showered, and ready for bed . . . [and] it is absolutely essential that the models have pretty faces and a personality not totally unrelated to sex appeal." Womack had also suggested to the photographers that they exchange customer names with the hope of compiling a master list of homosexuals. He himself had been convicted of selling obscene photographs via the mails. *Womack v. United States,* 111 U. S. App. D. C. 8, 294 F. 2d 204 (1961). More recently he has pleaded not guilty by reason of insanity to like charges. Washington Post, Feb. 1, 1962, p. D–3. Furthermore, he was warned in March, April, and July of 1959 that a number of his photographer advertisers were being prosecuted for mailing obscene matter and that he might be violating the law in transmitting through the mails their advertisements. However, he continued to disseminate such information through the mails, removing photographers from his lists only as they were convicted. Finally, through another controlled corporation not here involved, he filled orders for one of his advertisers sent in by the readers of his magazines. This material was found to be obscene and like all of the above facts and findings it is not contested here.

The corporate petitioners are chargeable with the knowledge of what they do, as well as the knowledge of their president and leader. How one can fail to see the obvious in this record is beyond my comprehension. In the words of Milton: "O dark, dark, dark amid the blaze of noon." For one to conclude that the above undisputed facts and findings are insufficient to show the required scienter, however stringently it may be defined, is in effect

to repeal the advertising provisions of § 1461. To condition nonmailability on proof that the sender actually saw the material being sold by his advertisers is to portray the Congress as the "mother" in the jingle, "Mother, may I go out to swim? Yes, my darling daughter. Hang your clothes on a hickory limb and don't go near the water."

For these reasons I would affirm the decision below.