**CITY OF ST. LOUIS, (Plaintiff) Appellant,**

v.

**Anthony J. MIKES, (Defendant) Respondent.**

**CITY OF ST. LOUIS, (Plaintiff) Appellant,**

v.

**Charles Bud ELLIOTT, (Defendant) Respondent.**

**CITY OF ST. LOUIS, (Plaintiff) Appellant,**

v.

**Joan Faith WARE, (Defendant) Respondent.**

Nos. 30733–30757.

St. Louis Court of Appeals.

Missouri.

Nov. 19, 1963.

Rehearing Denied Dec. 9, 1963.

Thomas J. Neenan, City Counselor, Eugene P. Freeman, Associate City Counselor, Stephen M. Hereford, Assistant City Counselor, St. Louis, for appellant.

James J. Rankin, Richard Wolff, St. Louis, for respondents.

WOLFE, Judge.

The matter here considered involves twenty-five appeals. All arise out of charges of certain ordinance violations which are based upon the same set of facts, except for the dates that the violations were charged to have occurred. By permission of this court and upon stipulation of counsel, the appeals were consolidated for briefing and argument, and all will be passed upon by this opinion. There was

an acquittal of all defendants upon trial in the Court of Criminal Correction, and the City of St. Louis prosecutes these appeals.

Defendants Mikes and Elliott were charged under an ordinance known as Section 38, Chapter 46, Revised Code of St. Louis. This ordinance provides in part that any person who shall "permit to be exhibited or performed, upon premises under his management or control, any indecent, immoral or lewd play or other representation shall be deemed guilty of a misdemeanor."

Defendant Ware was charged under Section 37, Chapter 46, Revised Code of St. Louis, which provides that any person who shall appear in a public place "in a state of nudity or in a dress not belonging to his or her sex in an indecent or lewd dress, or shall make an indecent exposure of his or her person, or be guilty of an indecent or lewd act of behaviour shall be guilty of a misdemeanor."

These charges arose out of a performance by defendant Joan Faith Ware. The same performance was put on nightly in a tavern called "Stardust Lounge". This place was owned and operated by a corporation known as "Stardust Lounge, Incorporated". Defendant Elliott was president of the corporation. On nine different occasions defendant Ware was arrested by police officers who viewed her performance. On seven of these occasions both defendants Elliott and Mikes were present, and both were arrested. On two occasions, only Elliott was present, at which time he was arrested with defendant Ware. These arrests started on June 13, 1960, and continued through June 22, 1960.

It was conceded upon trial that Mikes and Elliott employed defendant Ware to perform her act, and that it was performed with their permission upon premises under their control. Because of this there remained but one issue to be tried, and that was whether defendant Ware was guilty.

If she was guilty, then so were defendants Mikes and Elliott.

These cases were first tried in the City Court, and that trial resulted in acquittal on all charges. The City of St. Louis appealed to the Court of Criminal Correction. There a jury was waived, and, as stated, upon trial to the court all defendants were again acquitted upon all charges. It is from these judgments of acquittal that the City prosecutes these appeals.

For the reasons stated above, the evidence presented in the Court of Criminal Correction was limited to the determination of whether or not the acts and performance of defendant Ware were lewd and indecent. The performance took place in a room described by the police officer as being about 50 feet by 50 feet in area. There was a bar at which customers could be seated for service and a smaller bar for preparing drinks to be served at tables. The room was otherwise furnished with tables and chairs, except for a small space used for social dancing by the customers of the establishment. There was a three-piece orchestra provided. The floor show was conducted in the dancing area, which consisted of an entertainer telling jokes for about a half hour and the performance by defendant Ware. Her act started from a small, round, revolving platform which looked like the top of a rather large bird bath, with simulated spouts of water which arched upward from its rim. This platform was located about 10 feet from the nearest tables.

Defendant Ware started her performance by mounting the platform. The platform revolved slowly as the three-piece orchestra played. When the defendant mounted the platform she was fully clothed. She was wearing an evening gown, with a scarf covering her head. As the music played and the platform slowly revolved, the defendant assumed various simple poses with her hands and arms. She also displayed her leg through a drape or slit in her dress. She then started to remove her

clothing. She proceeded slowly to remove the scarf about her head. Then she removed part of her dress covering the upper part of her torso. As she removed the various parts of clothing, she dropped them into a container near the platform. She slowly removed her skirt, and after holding it at arm's length, dropped it into a container. At this point in her disrobing, she was wearing a brassiere and a scant pair of underpants. Attached to the top of the pants, or to a belt of sorts, were transparent panels, one in front and two in the rear. She then went through some gyrations in time to the music, and assumed some poses. This was followed by her descent from the platform to the dance floor. She sat on the floor close to the customers and went through some more body gyrations.

After this she went to the side of the platform and simulated pouring water from a jug. She then removed an outer brassiere, which she dropped into the container. Under this outer brassiere she was wearing another one, sheer but bespangled and scant. She then returned to the dance floor and went through some more gyrations, after which she returned to the platform and removed the panels which were attached to her costume. The tempo of the music changed, and in a standing position she grasped her ankles and shook her buttocks from side to side. Then standing erect, she did some hip movements. Returning again to the dance floor, she assumed a semi-kneeling position in front of the platform and moved her torso in an up-and-down motion. At this time she was clad in what might best be described as a very scant brassiere and pants. She turned facing the audience, and some of those present yelled, "More, more—take it off. More, more." This ended the performance.

A number of photographs and motion pictures had been taken of the act by the police officers. These were before the trial court and shown here on appeal. Three witnesses who viewed the motion pictures stated that they considered the performance below the moral standards of the City of St. Louis. A dancing instructor, who had been so engaged for many years, testified that the performance was not dancing, and that there were but a few times during the performance that any recognizable dance steps were taken by the defendant.

The defendants called two witnesses, who found nothing objectionable in the dance. One of them testified that there was a motion picture shown in St. Louis, called "Expresso Bango", in which there was considerable female nudity. There was evidence submitted that there were burlesque shows in St. Louis. In addition to the foregoing, a motion picture of a very short portion of the play "Kismet", which had been put on by the Municipal Opera, was shown in evidence. The part shown was an oriental dance which fitted into the plot of the play. The dancer was much more fully clothed than defendant Ware had been.

Defendant Elliott testified that he had been engaged in the operation of tavern-type night clubs in St. Louis for a number of years, and that he employed girl dancers who took off part of their clothing. He said that defendant Ware's dance was only eight to ten minutes in length, and that his whole floor show, which consisted in part of music and an impersonator, required a full hour to put on.

Defendant Ware testified that she was an "exotic dancer" by profession. She said that she had studied at many dancing schools. She stated that none of them taught exotic dancing; that her dance, the "Fountain of Love", was a dance of her own arrangement and was of Grecian motif.

The motion pictures, the photographs, and the foregoing facts constituted all of the pertinent evidence before the trial court which, as stated, found the defendants not guilty.

■ There is no question raised as to the right of the City to appeal from a judgment for the defendant in a proceeding for violation of an ordinance. Insofar as the right of appeal is concerned, such action is civil in nature, and the City has the same right to appeal as any other party to a civil action. Section 3, Article XII, The Charter of the City of St. Louis; City of St. Louis v. Penrod, Mo.App., 332 S.W.2d 34; City of Clayton v. Nemours, 237 Mo.App. 167, 164 S.W.2d 935.

The only point raised by the appeal is that the court's judgment was erroneous in that it reached the conclusion that the defendants were not guilty by giving weight to immaterial and irrelevant evidence. The court made a finding that there was a dance in the play "Kismet" which was known as "bumps and grinds". It also found that there was a motion picture shown in St. Louis, called "Expresso Bango", in which there were women scantilly dressed. It found that there had been burlesque shows in St. Louis for many years, and that night clubs offered entertainment similar to that performed by defendant Ware. Without any further finding, and in apparent reliance upon the finding that burlesque, night club shows, and dancers on a par with the act of the defendant had been shown in St. Louis, and that a lewd motion picture had been shown, the court concluded that the City had failed to make a case against the defendants.

The fact that the court rested its opinion solely upon this is fortified by a statement made by the Judge in response to the request of the City Attorney for time to file a brief. This request came at the close of the evidence and after counsel for the defendants had moved to dismiss the cases. The following colloquy took place:

"THE COURT: I'm inclined to agree with Mr. Rankin. I have heard this case for two days, and I don't think the City has shown a case against the defendants. How can such a dance be permitted at the Opera, which is a matter of a few blocks away from the defendant's premises? How can they permit such a showing at the Pageant Theater, which is in the same general area?

"MR. FREEMAN: Does the Court want arguments on this point?

"THE COURT: No, my mind is made up."

■ From the foregoing it is evident that the court did not pass upon the question before it. The evidence that there were other performances, motion pictures, etc., which may or may not have been equally or more susceptible of being classified as lewd and indecent, was of questionable value as a measure of the quality of the performance here considered. Community tolerance of obscenity does not establish community standards of morality or make obscenity less obscene. Clarke v. United States, Municipal Court of Appeals for the District of Columbia, 160 A.2d 97; Commonwealth v. Donaducy, Superior Court of Pennsylvania, 167 Pa.Super. 611, 76 A.2d 440.

The question of what is indecent, lewd, or obscene—and the words are used interchangeably in many statutes and cases—has been difficult for the courts to define. Much has been written on the subject in opinions dealing with the use of the mail. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498; Manual Enterprises v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639. Both of these cases deal with the construction of the federal statute. The case of Manual Enterprises v. Day, with one concurring opinion and one dissenting opinion, covers a total of 44 pages, with the dissenter concluding that the majority opinion "requires the United States Post Office to be the world's largest disseminator of smut and Grand Informer of the names and places where obscene material may be obtained."

These cases are of little aid in formulating a definition of indecent, lewd, or obscene. Perhaps the most acceptable definition is contained in the American Law Institute's Model Penal Code, Tentative Draft No. 6. There obscenity is defined in part as "material which appeals predominately to prurient interest in sexual matters and which goes beyond customary freedom of expression." It goes on to say: " * * 'appeal to prurient interest' refers to qualities of the material itself: the capacity to attract individuals eager for a forbidden look." The first part of this definition follows the definition heretofore used in such cases as In re Tahiti Bar, Inc., 395 Pa. 355, 150 A.2d 112; Adams Theatre Co. v. Keenan, 12 N.J. 267, 96 A.2d 519.

It seems, however, that there are areas in which attempted definitions confuse rather than enlighten. Indecency, lewdness, and obscenity may in many forms and in many ways offend. On the other hand, art and sincere graphic writing may appear lewd to some but wholesomely delightful and instructive to others. We are of the opinion that the Missouri Supreme Court, in State v. Becker, 364 Mo. 1079, 272 S.W.2d 283, l. c. 286, stated the manner in which the subject should be reviewed when it said: " * * * judges may know what falls within the classification of the decent, the chaste and the pure in either social life or in publications, and what must be deemed obscene and lewd and immoral and scandalous and lascivious."

■ We have viewed and considered objectively the pictures of the performance here in question, and find the performance nothing more than modern burlesque. It was as devoid of art and beauty as a garbage pail, and was just "dirt for dirt's sake". The defendants violated the ordinances in question. Adams Theatre Co. v. Keenan, supra.

We therefore reverse and remand all of the cases to the Court of Criminal Correction for action consistent with the views herein expressed.

RUDDY, P. J., and ANDERSON, J., concur.